FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

APR 16 2010

Stephan Harris, Clerk
Cheyenne

GLENN E. SMITH
GLENN E. SMITH & ASSOCIATES
216 LONGS PEAK DRIVE
CHEYENNE, WY 82009
Telephone: (307) 635-4912

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **PAMELA R. GOERTZ, a Wyoming**<br>**resident,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   Civil No. 09-cv-236 |
| | ) |
| **THE PRUDENTIAL INSURANCE COMPANY** | ) |
| **OF AMERICA, a New Jersey corporation,** | ) |
| | ) |
| **Defendant.** | ) |

## PLAINTIFF'S BRIEF IN SUPPORT OF HER
## MOTION FOR SUMMARY JUDGMENT

The Plaintiff in the above referenced action, by and through her attorney of record, Glenn E. Smith, respectfully submits the following brief in support of her Motion for Summary Judgment for the Court's review and consideration.

### INTRODUCTION

Plaintiff initiated this action on September 15, 2009 following the Defendant's denial of Plaintiff's claim for long-term disability benefits under an employee benefit plan ("Plan") established by her employer, Holme, Roberts & Owen, LLP ("HR&O"). Following Defendant's initial denial of her claim, AR 382-84, Plaintiff filed two administrative appeals under the Plan, both of which were similarly denied. AR 308-13; AR 353-61. Plaintiff contends now, as then, that because of her

history of seizures, including a grand mal seizure suffered on January 4, 2006, epilepsy, symptoms of multiple sclerosis and scoliosis, frequent falls and near falls, weakness in her limbs, poor memory and inability to concentrate, severe headaches and dizzy spells, sleep apnea and restless leg syndrome, debilitating back and leg pain, loss of balance, diffuse white matter changes on her brain, fatigue, unstable gait, and the side effects of multiple medications, she was and remains totally disabled from her own occupation as paralegal/secretary in a large Denver, Colorado law firm. In spite of all this, and the statements by no less that three different attending physicians that Plaintiff is totally disabled from all work, the Defendant continues to assert that she is capable of "sedentary work" and, therefore, is not totally disabled under the Plan.

## STATEMENT OF FACTS

Plaintiff believes that the following statement of facts, all of which are derived from the administrative record filed by the Defendant in this case, are uncontested.

Plaintiff is 61 years of age. AR 132. Other than for the $1407 she receives every month because she was found to be totally disabled by Social Security, she had has no income whatsoever since April 15, 2006. AR 10. Plaintiff has a total of 37 years of experience in the legal field prior to becoming disabled from work, culminating with her employment by HR&O as a paralegal and legal secretary. AR 85. While working in this capacity for HR&O, Plaintiff suffered a grand mal seizure on January 4, 2006 and subsequently hospitalized. AR 153, 354.

On March 16, 2006 Plaintiff quit her job with HR&O because she could simply no longer perform her job duties. AR 09. At the time she became disabled from work, Plaintiff was legal secretary to three different attorneys. Id. Her job was very stressful and required a high level of concentration and organizational skill. Id.

Plaintiff was initially prescribed Trileptal and was later switched over to Keppra, an anti-epileptic/seizure medication. AR 52. Plaintiff still takes Keppra today and seems to have controlled

her seizures, but not her dizziness, loss of balance, falls, numbness, and similar type symptoms. AR 53. After Plaintiff became disabled from work, her physical problems steadily deteriorated. AR 10. She suffered from serious, ongoing headaches, inability to concentrate, lack of strength, inability to walk any significant distance, confusion, constant pain in her legs and back, numbness in her extremities and face, pain while sleeping, sleep apnea, restless leg syndrome, scoliosis, and back pain from bulging discs. AR 10-11. Plaintiff suffers dizzy spells and loss of balance and has experienced many falls and near falls. AR 10. Her level of pain and discomfort causes her to stay at home except to buy groceries and prescriptive drugs, get her mail, and occasionally visit her son, who lives a short distance from her own home. AR 84. She also is a victim of severe depression, anxiety, epilepsy, worsening scoliosis, and is legally blind in one eye. AR 89-90. Her medications in June of 2006 included Paxil, Lipitor, and Hydrocodone for pain, along with Celebrex, Xanax, and Kionopin. AR 53. The Defendant's medical reviewer acknowledges that these medications "have the potential to adversely affect cognition." AR 55. However, since the Plaintiff's medical records did not refer to these side effects, the reviewer concluded there were no side effects. Id.

Because of these debilitating problems, Plaintiff filed a claim for disability benefits under the Defendant's group long-term disability plan on June 20, 2006. AR 136-37. Accompanying her claim for benefits was an attending physician's statement from Plaintiff's neurologist, Dr. Stanley Ginsburg, dated June 22, 2006. AR 132, 134-35. He diagnosed Plaintiff as suffering from a seizure disorder and depression. Id. Her medical impairments were listed as worsening concentration and worsening gait abilities. Dr. Ginsburg stated that Plaintiff's prognosis for a return to work was "poor" and that Plaintiff should be restricted from driving. Id.

By letter dated September 6, 2006, Defendant denied Plaintiff's claim for disability benefits. In denying her claim Defendant acknowledged Plaintiff's grand mal seizure, her abnormal EEG, and an MRI showing diffuse white matter changes on her brain. AR 382. Defendant further

3

acknowledged Plaintiff's primary complaints of fatigue, inability to think properly with memory problems, and generalized cognitive problems, but dismissed all of these complaints because Plaintiff was able to drive on occasion, recite her medical history, administer her medications, show up for medical appointments, and make her own financial decisions. AR 383. Defendant also acknowledged that Plaintiff was totally disabled from work through April 24, 2006, as defined by the Plan, but stated that Plaintiff's medical records beyond that date did not support impairment to the point that she was unable to perform her occupation as a legal secretary. *Id.* Defendant also stated that the physical exams performed by Plaintiff's doctors failed to demonstrate that she could not perform her occupation "as the exams for the most part were normal with very limited functional limitation." *Id.*

By letter dated October 26, 2006, Plaintiff filed an administrative appeal contesting Defendant's claim denial. AR 10-12. One of the additional documents furnished by Plaintiff in support of her appeal was an attending physician's statement from another of her physicians, Dr. William A. Kubaska, dated September 13, 2006. AR 20. Dr. Kubaska diagnosed Plaintiff with a seizure disorder and depression, listing subjective complaints as frequent falls and objective findings as the results of an EEG and temporal focus. *Id.* He listed Plaintiff's medications as Keppra, Lipitor, Celebrex, Paxil, Klompin, and Requip. *Id.* Dr. Kubaska indicated that Plaintiff was not only totally disabled from her own job, but all other work as well, and that he did not expect a fundamental or marked change in her future condition. *Id.* As Dr. Ginsburg was to also conclude four months later, Dr. Kubaska gave plaintiff the highest possible physical impairment rating, Class 5, meaning a functional impairment limitation so severe that Plaintiff was not even capable of sedentary activity. *Id.* He also gave Plaintiff a Class 5 mental impairment, meaning that Plaintiff has severe mental limitations, including significant loss of psychological, physiological, personal and social adjustment. *Id.*

4

In her appeal letter, Plaintiff further called Defendant's attention to the white matter spots that showed up on Plaintiff's MRI films, along with the concern expressed by Dr. Narotzky, a neurosurgeon who saw Plaintiff in Casper, Wyoming on October 11, 2006, about this condition. AR 11. Plaintiff further added in her appeal letter: "Every doctor that has examined me and my medical records and films over the last 10 months have told me that they are very concerned about the white matter changes in my brain." *Id.*

Instead of further investigating Dr. Kubaska's opinion that Plaintiff was totally disabled, or arranging for its own independent medical exam of the Plaintiff to resolve conflicting opinions between its medical reviewer and Dr. Kubaska, Defendant instead ordered surveillance on the Plaintiff to determine whether Plaintiff was feigning her symptoms and "self-reported" limitations. AR 14-18. The firm hired by Defendant placed Plaintiff under surveillance for four complete days on three different occasions (November 16-17, 20, and 30, 2006), and in that entire time was able to compile a two-minute video of Plaintiff engaging in simple tasks that Plaintiff never denied she could perform on one of her good days. *Id.* The video shows, for example, the Plaintiff pushing a very small amount of powdery snow (the width of a small shovel) outside of her sliding glass door so her pets wouldn't have to track snow in and out when let outside. *Id.* AR 85. It shows Plaintiff walking around her vehicle to pick up and carry an empty cardboard box that weighed less than a pound. *Id.* AR 84. It showed her stooping over to see if repairs had been made to the foundation of her home. *Id.* AR 84-85. Defendant places great reliance on this two-minute video taken over four days to support its denial of Plaintiff's disability claim. Largely on the basis of this video, the Defendant concluded that Plaintiff was feigning her restrictions and limitations and that she was not totally disabled. As a result Defendant denied the Plaintiff's first administrative appeal by letter dated January 17, 2007. AR 308-313.

5

Plaintiff has always maintained, and has consistently informed the Defendant and her physicians, that she has her good days and bad days and that on her good days she is capable of performing the minimal tasks captured on two minutes of video by the Defendant's surveillance firm. AR 52, 85, 217, 312. On bad days, however, Plaintiff cannot even leave her home or get out of bed, as evidenced by the fact that in four entire days Prudential was only able to capture the Plaintiff outside of her home for a few minutes. AR 85, 14-18. The remainder of the time the Plaintiff was, in fact, confined to her home. AR 84. In fact, ever since Plaintiff's grand mal seizure in January of 2006, Plaintiff rarely leaves her home and when she does it is usually to buy food, purchase prescriptive drugs, get her mail, or visit her son and daughter-in-law a very short distance from her home. Id.

As further support for the denial of Plaintiff's first appeal, Defendant obtained a peer review report from a neurologist by the name of Dr. Partnow to conduct a "paper review" of the Plaintiff's medical records. AR 52-56. From this paper review Dr. Partnow concluded that the Plaintiff was able to return to work because her medical records did not support a functional impairment. AR 54. Because Plaintiff's symptoms remain undiagnosed to some degree, in other words, Dr. Partnow believes Plaintiff is capable of returning to work and is not totally disabled. Id. He further concluded there were no "objective findings" to support her complaints of chronic pain even though the administrative record is replete with references to bulging discs in Plaintiff's back. AR 55. Finally, Dr. Partnow concluded that Plaintiff is not be disabled from work because no one has ever made a neurological diagnosis of her symptoms and, further, the surveillance tape contradicts Plaintiff's reports of her own limitations and restrictions. AR 55. In arriving at this conclusion, Dr. Partnow completely ignored the finding by Dr. Kubaska that Plaintiff was totally disabled and her functional capacity was severely limited. No effort was made by Dr. Partnow to reconcile the disparate

conclusions – one stating her physical impairments were so severe she could not engage in sedentary activity and the other stating she had no physical impairments whatsoever. *Id.*

By letter dated March 8, 2007 Plaintiff appealed the denial of her claim a second time. In support of her second appeal Plaintiff submitted a statement from Dr. Robert Narotzky, a neurosurgeon in Casper, Wyoming dated February 7, 2007. AR 63. He diagnosed Plaintiff with white matter gliosis, small vessel disease, seizures, and numbness. *Id.* Dr. Narotzky performed a brain biopsy on Plaintiff on December 29, 2006 and expressed great concern about the white matter changes in Plaintiff's brain. *Id.* He found Plaintiff to be both permanently and totally disabled. *Id.* He gave Plaintiff a Class 4 physical impairment rating, meaning a moderate limitation of function capacity, still far different from Dr. Partnow's finding of no impairment whatsoever. *Id.* At the same time Plaintiff submitted yet another statement from Dr. Ginsburg, a neurologist in Denver, Colorado, on February 12, 2007. AR 62. He diagnosed Plaintiff with a seizure disorder and sleep apnea and listed his objective findings as an abnormal EEG and MRI and sleep studies. *Id.* Like Dr. Kubaska, Dr. Ginsburg found Plaintiff to be totally disabled from work and gave Plaintiff a Class 5 physical impairment rating, meaning that her impairments were severe and she was incapable of sedentary work. *Id.* Defendant made passing reference to Dr. Ginsburg's neurological opinion that Plaintiff was unable to return to work as a legal secretary but summarily dismissed his opinion without obtaining its own independent medical exam, attempting to contact Dr. Ginsburg or making any effort whatsoever to determine the basis for his opinion, or attempting to interview the Plaintiff. *Id.* In her second appeal letter, Plaintiff detailed her medical treatment from Dr. Ginsburg, Dr. Corboy, and Dr. Narotzky, along with her mental evaluation by Amy Crockett, Ph.D., to further establish that she was unable to return to work. AR 81-84.

In her second letter of appeal, Plaintiff also responded in detail to the video surveillance conducted by Defendant after her initial claim denial. AR 84-85. She thoroughly explained how the

video actually supports her claim for disability and how Defendant twisted and distorted the results of the video in a prejudiced effort to support its own claim denial. *Id.* Plaintiff detailed how she is able to perform some menial tasks on her good days – and that on her bad days she would have been totally unable to leave her home. *Id.* This fact was ignored by the Defendant and by Dr. Partnow. She also relayed to Defendant how she feels better when well rested but is apt to have one of her bad days after exertion or when she suffers a lack of sleep. AR 85. Plaintiff again reiterated in her second appeal that she continues to experience severe and debilitating headaches and dizziness, that she experiences extreme back pain, that her gait is very shaky and unstable, that she has no strength in her hands, and that she suffers from chronic insomnia. AR 86. She specifically reminded the Defendant that three different physicians at different times all found Plaintiff to be totally disabled from work. AR 86.

In further support of her second appeal Plaintiff also submitted a Notice of Award of benefits from the Social Security Administration, dated December 19, 2006, finding that Plaintiff was totally disabled from all gainful employment as of March 16, 2006. AR 69-80. Plaintiff was awarded past due disability benefits and began receiving, and is presently receiving, the monthly sum of $1407.00 from Social Security because of her disability. AR 79. Plaintiff also submitted a report from Amy B. Crockett, Ph.D., a psychologist seen by Plaintiff in connection with Plaintiff's claim for Social Security disability benefits, summarized Plaintiff's medical history and physical disability on November 6, 2006 as including tremors, numbness in her extremities, dizziness, weakness, and depression. AR 89-92. She was also noted as suffering from anxiety, scoliosis of the spine, and legal blindness in her left eye, among other things. Ms. Crockett continued her summary of Plaintiff's problems as follows:

Ms. Goertz is a woman who was functioning well until she had a Grand Mal seizure in January of 2006. Since then, she has had problems with dizziness, unsteadiness, and forgetfulness. She has had several tests and has been

8

diagnosed with Epilepsy, obstructive sleep apnea, and restless leg syndrome. She also has scoliosis, which causes pain in her back and legs. She has had a phobic fear of crowds for years and has anxiety attacks several times a week. Her anxiety has worsened over the last several months and she has been feeling depressed as well. Her sons help her with activities of daily living at this time. She had to quit her job because she could not maintain her responsibilities adequately anymore.

Ms. Goertz has the cognitive ability to learn and retain information for several work-related tasks. Memory skills appear to be adequate for simple tasks, but she described having trouble with more complex ones. She has needed help from her sons to manage her finances, and she has had poor concentration and organization. **This would negatively affect her ability to work at this time. Persistence and pace would be lower than average at this time because of the depression, low energy, and headaches.** * * * AR 92. [Bold emphasis added].

On March 21, 2007, following Plaintiff's second appeal in which she submitted attending physician statements from Dr. Ginsburg and Dr. Narotzky stating she was totally disabled, Defendant requested a supplementary report from Dr. Partnow to see if any of the materials submitted by Plaintiff in connection with her second appeal changed any of his previous opinions. AR 125-128. In confirming his previous opinions, however, Dr. Partnow totally failed to review, or even acknowledge, the opinion by Dr. Ginsburg that Plaintiff was totally disabled and her physical impairment was severe. *Id.* He did acknowledge Dr. Narotzky's statement that Plaintiff was totally disabled, AR 127, but did not analyze, comment upon, or seek to reconcile his opinion with either of Plaintiff's treating physicians.

By letter dated April 5, 2007, Defendant denied Plaintiff's second appeal of her disability claim denial. AR 353-61. She was informed that no further appeals at the administrative level were allowed. AR 363.

## STANDARD OF REVIEW

The Prudential summary plan description reserves unto Prudential the discretion to interpret the terms of the contract, make factual findings, and determine eligibility for benefits. AR 435. This language appears sufficient to create an arbitrary and capricious standard of review in this case.

9

However, Prudential is a conflicted fiduciary under the facts and circumstances of this case because it serves as the plan administrator of the Prudential long-term disability plan, with ultimate authority to approve or deny claims, but also stands to benefit financially from denying benefit claims. *Id.* That conflict, therefore, must be considered as a factor in whether the Plaintiff's denial of benefits was arbitrary and capricious and, in the discretion of the Court, reduces any deference that may be otherwise accorded to the claim administrator under an arbitrary and capricious standard of review.

## LEGAL ARGUMENT

Assuming an arbitrary and capricious standard of review for present purposes, a reviewing court under Tenth Circuit law upholds an ERISA administrator's claim decision "so long as it is predicated on a reasonable basis." *Adamson v. Unum Life Ins. Co. of Am.,* 455 F.3d 1209, 1212 (10th Cir. 2006). Certain indicia of an arbitrary and capricious denial of benefits include "lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of North America,* 287 F.3d 1276, 1282 (10th Cir. 2002). Substantial evidence has been defined by the Tenth Circuit as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992**). "In determining whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight."** *Id.* [Bold emphasis added]. When an insurer of the plan serves as both insurer and administrator of the plan, "an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound" is created. *Pitman v. Blue Cross & Blue Shield of Okla.,* 217 F.3d 1291, 1296 n.4 (10trh Cir. 2000). In such situations the U.S. Supreme Court has instructed that courts weigh the conflict of interest "as a factor in determining whether the plan administrator has abused its discretion in paying benefits * * *" *Metro. Life Ins. Co. v. Glenn,* 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008). The Tenth Circuit has interpreted *Glenn* to embrace

10

"a combination-of-factors method of review" that allows judges to take account "of several different, often case-specific, factors, reaching a result by weighing all together." *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009). The importance attached to the existence of a conflict of interest is proportionate to the likelihood that it affected the decision to deny benefits. *Id.*

In light of existing Tenth Circuit law, there can be no doubt that the Defendant's decision to deny Plaintiff's claim for disability benefits was arbitrary and capricious. This conclusion can be reached on any number of grounds, including the following:

### A. IT IS ARBITRARY AND CAPRICIOUS FOR DEFENDANT TO COMPLETELY IGNORE THE OPINIONS OF THREE TREATING PHYSICIANS, ALL STATING THAT PLAINTIFF WAS SERIOUSLY IMPAIRED AND TOTALLY DISABLED FROM WORK.

Plaintiff submitted attending physician statements to the Defendant from no less than three different treating physicians on three different occasions. The first, from Dr. Kubaska, was submitted to Defendant as part of her first appeal and the other two, from Dr. Narotzky and Dr. Ginsburg, were submitted in connection with her second appeal. **All three treating physicians found the Plaintiff to be totally disabled from work. Two of the physicians, Dr. Narotzky and Dr. Ginsburg, gave Plaintiff a Class 5 impairment rating and found Plaintiff incapable of even sedentary work while the third, Dr. Kubaska, gave her a Class 4 physical impairment rating.** Dr. Kubaska specializes in internal medicine, Dr. Narotzky is a neurosurgeon, and Dr. Ginsburg is a neurologist.

In denying the Plaintiff's two administrative appeals, **the Defendant totally ignored these opinions from all three treating physicians.** AR 308-313, 353-361. In its first appeal denial, Defendant acknowledged receipt of Dr. Kubaska's attending physician statement, AR 308, but did not review, analyze, or attempt to reconcile his opinion with that of Dr. Paltnow. Instead, Defendant placed sole medical reliance on the paper review and opinion of its own Dr. Partnow, AR 311-12, who himself totally ignored the opinions of Plaintiff's three treating physicians. Indeed, it is clear that

11

Dr. Partnow deliberately ignored Dr. Kubaska's opinion that Plaintiff was totally disabled because Dr. Partnow quotes from Dr. Kubaska's attending physician's statement in his "independent" peer review letter for other purposes. AR 120. In the second appeal denial, the Defendant mentioned Dr. Narotzky's attending physician report in passing, as did Dr. Paltnow, AR 127, but did not review, analyze, or attempt to reconcile it with Dr. Paltnow's opinion. AR 357. Dr. Ginsburg's attending physician statement didn't warrant mention, even in passing, in any of the Defendant's appeal decisions nor in Dr. Paltnow's paper review of Plaintiff's medical records.

While ERISA plan administrators are not required to automatically accord special weight to the opinions of a claimant's physician, neither may they "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325-26 (10th Cir. 2009), citing *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965. 155 L.Ed.2d 1034 (2003). That is precisely what the Defendant did here. With no explanation whatsoever, it arbitrarily refused to consider the opinions of Dr. Ginsburg, Dr. Kubasky, and Dr. Narotzky, in which physician stated categorically that Plaintiff was totally disabled and seriously impaired. See also *Warden v. Metropolitan Life Ins. Co.*, 574 F.Supp2d 838 (M.D. Tenn. 2008); *Rodgers v. Metropolitan Life Ins. Co.*, 655 F.Supp.2d 1081 (N.D.Cal. 2009); and *DeGennaro v. Liberty Life Assur. Co. of Boston*, 561 F.Supp.2d 811 (W.D.Mich. 2008). In the present case, the Defendant's conclusion that Plaintiff was not totally disabled could only be made by completely ignoring the favorable opinions of all three of her treating physicians. That results in an arbitrary and capricious claim denial for want of a deliberate, principled reasoning process. *Moledetskiy v. Nortel Networks Short-Term and Long-Term Disability Plan* 594 F.Supp.2d 870 (M.D.Tenn. 2009).

Further, the physician-reviewer upon whom the Defendant relied, Dr. Partnow, never contacted any of Plaintiff's treating physicians to determine why they believed that Plaintiff was

totally disabled and incapable of sedentary work, a factor itself indicating arbitrary and capricious denial of benefits, *Dockery, supra* at 11, nor did Dr. Partnow contact or conduct a physical examination of the Plaintiff. See *Kalish*, 419 F.3d at 508 (["Whether a doctor has physically examined the claimant is indeed one factor that [this Court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving great weight to the opinion of its consulting physician."]. Indeed, the Defendant's Plan gives it the right to perform an independent medical exam upon disability claimants so plan administrators do not have to rely upon medical records that may not yield a clear picture of the claimant's disability. All of these factors point to an arbitrary and capricious claim denial. See *Moledetskly, supra* at 887 [decision of administrator of employee benefit plan to deny claim for long-term disability benefits was arbitrary and capricious, under ERISA, for want of a deliberate, principled reasoning process; administrator relied solely on consulting physician's review of plan participant's claim file in denying participant's claim for long-term disability benefits, despite fact that consulting physician's determination was inconsistent with medical evidence, reviewing physician did not contact participant's treating physician, did not explain why treating physician's opinion should be ignored and discounted, and administrator failed to avail itself of its right under the plan to obtain an Independent Medical Examination (IME) that involved a physical examination of the participant].

A decision that is eerily similar to the present case is *Dockery v. USG Retirement Plan,* 22009 WL 2960471 (E.D.Mich. 2009). The holding of that case at p. 10 is applicable here:

[I]n challenging the Plan's decision to deny his disability retirement benefits, Plaintiff principally contends that the Plan failed to give proper weight to the opinions of his treating physicians and the medical records, which indicated that he suffered severe spinal, sensory and motor deficits. **\* \* \* Specifically, the Court concludes that the Plan has failed to offer a reasoned explanation for its decision; rather, it appears to have relied exclusively on the opinions of hired independent medical examiners who in turn did not provide a sufficient basis for rejecting the opinions of Plaintiff's treating physicians. A decision reached under these circumstances is deemed "arbitrary and capricious" under controlling Sixth**

**Circuit precedent.**

The administrative record provided the Committee with extensive evidence relating to Plaintiff's hip and spine conditions, as well as chronic pain, **though it provided no definitive medical opinion regarding Plaintiff's long-term ability to work or his prognoses for recovery. Two of Plaintiff's treating physicians described him as disabled to work or totally disabled.** * * * **Solely on the basis of a file review, the independent medical examiners hired by the Committee concluded that Plaintiff had failed to show that he was totally and** *permanently* **disabled, under the terms of the Plan. The Committee in turn summarily adopted these conclusions, despite the fact that the examiners neither sought to address the treating physicians' view that Plaintiff is in fact disabled, nor fully explained the basis for their findings.**

* * *

**[T]he Committee failed to fully address much of the contrary evidence in the record, substituting the conclusions of hired physicians instead. The Court finds that this was an abuse of discretion where the independent medical examiner declined to credit the diagnoses of Plaintiff's treating physicians without meaningful explanation. * * * Neither examiner contacted Plaintiff's treating physicians to discuss prognoses for long-term recovery or treatment options, despite the fact that those physicians had been treating him for several years. Finally, neither examiner conducted a physical examination.** [All citations omitted] [Bold emphasis added].

The refusal of the Defendant and its consulting physician to even consider the opinions of

Plaintiff's three treating physicians not only amounts to an arbitrary and capricious claim denial. It

also represents an egregious act of bad faith.

## C.   IT IS ARBITRARY AND CAPRICIOUS FOR DEFENDANT TO ENGAGE IN A SELECTIVE REVIEW OF THE EVIDENCE CONTAINED IN THE ADMINISTRATIVE RECORD IN ORDER TO UPHOLD THE DENIAL OF PLAINTIFF'S CLAIM FOR DISABILITY BENEFITS.

Closely related to the arbitrary manner in which the Defendant refused to credit the opinions

of Plaintiff's three treating physicians is the Defendant's selective review of the administrative record

for the purpose of upholding the denial of Plaintiff's disability claim. "If an ERISA administrator

hand-picks among the medical evidence, then the administrator acts arbitrarily and capriciously."

*Warden v. Metropolitan Life Ins. Co.*, 574 F.Supp.2d 838 (M.D.Tenn 2008). In the words of the

Sixth Circuit in *Moon v. Unum Provident Corp.*, 403 F.3d 381 (2005), an administrator abuses its

discretion when it engages in a "selective review of the administrative record" to justify a decision to

termination coverage. **See also** *Rasenack*, **585 F.3d at 1326 [Tenth Circuit held that it was arbitrary and capricious for insurer to "cherry-pick" the information helpful to its decision to deny Rasenack's claim and disregard the contrary opinions of the medical professionals who examined, treated, and interviewed Rasenack].**

That is precisely what Defendant did here. Aside from selecting only the medical evidence cited by its physician reviewer, totally ignoring the opinions of three treating physicians, the Defendant also ignored the Plaintiff's comprehensive and lengthy summarizations of her medical problems and restrictions and limitations in her two appeal letters, choosing instead to brand Plaintiff as "unreliable and clearly lacking credibility" because a two minute surveillance video happened to capture Plaintiff performing simply tasks she never denied she was able to engage in on one of her "good days." Defendant could just have easily mentioned that Plaintiff left the house on only one occasion during the four days she was under surveillance was because her medical problems would not allow her to do more. Other examples abound, among which are:

1. In order to deny coverage, Defendant relies on Dr. Ginsburg's statements in June of 2006 that Plaintiff could go back to work on a half time basis because Plaintiff was doing much better and not having seizures, AR 312, knowing full well that seven months later Dr, Ginsburg certified that Plaintiff was totally disabled and incapable of even sedentary work. This is nothing short of a blatant exhibition of bad faith by the Defendant in denying Plaintiff's benefit claim.

2. Defendant completely discounted an abnormal Romberg test administered by Dr. Narotzky and indicating a loss of balance and loss of motor coordination. AR 312.

3. Defendant refused to credit the strong possibility that white matter changes in Plaintiff's brain are explanative of her undiagnosed neurological symptoms because Plaintiff was not yet "demented" and could not yet be diagnosed with multiple sclerosis. AR 312, 357-58.

4. Defendant refused to credit the fact that the pain medication taken by Plaintiff, known to cause lack of concentration and other cognitive difficulties, was a factor in this case simply because the issue had not been mentioned in Plaintiff's medical records. AR 313, 359.

5. Defendant dismissed Plaintiff's seizure disorder on the basis that it had been controlled through medication, yet completely ignored and dismissed Plaintiff's frequent complaints of falls and near falls, headaches, dizziness, and unstable gait because her medical records did not disclose a neurological diagnosis which would explain them. AR 354.

6. Defendant contends that Plaintiff's complaints of an abnormal gait were never confirmed on physical examination knowing full well that Plaintiff had her good days in which these problems did not affect her that much and bad days in which they did. *Id.*

7. Defendant denied Plaintiff's claim in part because the administrative record did not contain evidence of restrictions on Plaintiff's ability to sit, stand, walk, lift, carry, reach, and perform repetitive activities when there was never any testing done, such as a functional capacity exam, by which such limitations could be established. AR 355.

8. Defendant completely dismissed the finding by a psychologist, Amy Crockett, that Plaintiff was unable to work, a because her report was not "a formal neuropsychological examination of intellectual status." AR 357. The psychologist's finding that Plaintiff could not concentrate, lacked organizational skills, and could not perform complex tasks was ignored by Defendant because it was "self-reported" by Plaintiff. *Id.*

9. Defendant denied Plaintiff's claim partly because of a lack of objective medical evidence or, as Defendant puts it, "no objective neurological deficit," knowing full well that the Plan does not require total disability to be established by objective medical evidence.

10. The Plaintiff's diagnosis of major depressive disorder and recurrent specific phobia was totally ignored by the Defendant as a factor in Plaintiff's inability to perform the material duties of her job. AR 358.

11. Defendant denied Plaintiff's claim in part because of the absence of diagnostic testing to confirm numerous complaints registered by the Plaintiff, knowing full well that the Plan authorizes the Defendant to request an independent medical examination for that very purpose. AR 359.

12. The Plaintiff's complaints of debilitating and chronic pain were completely dismissed by the Defendant even though Plaintiff's physicians prescribed pain medication for Plaintiff throughout the period at issue and even though Plaintiff suffered from conditions known to cause severe pain and discomfort.

13. Defendant's medical reviewer at one point in his report states unequivocally that "there is no neurological deficit" and "no neurological diagnosis" of Plaintiff's symptoms, AR 128, but at the same time, and in the same report, indicates that an abnormal EEG "was thought to be diagnostic of epilepsy." AR 126.

14. Defendant completely dismissed the finding by Social Security that Plaintiff was disabled without bothering to find out whether the rules for determining Social Security disability were different or whether Social Security reviewed any different evidence. AR 360

## C. IT IS ARBITRARY AND CAPRICIOUS FOR DEFENDANT TO UTILIZE ITS SURVEILLANCE VIDEO AS GROUNDS FOR DENYING PLAINTIFF'S CLAIM FOR DISABILITY BENEFITS.

The administrative record filed by the Defendant includes a two-minute video, compiled over four complete days of surveillance, that shows Plaintiff putting a cardboard box weighing less than a pound in her car, walking from garage to house, checking a satellite dish, stooping over to check the foundation of her house, walking inside and, and a later occasion, pushing a small shovel across her deck to create a narrow pathway for her pets to get outside. The notion that this short

17

videotape, taken over four full days of surveillance, establishes that Plaintiff is not totally disabled is nothing short of ludicrous, as anyone who watches it would quickly conclude. It is equally absurd for Defendant to assert that the video contradicts the Plaintiff's reports of her own limitations and restrictions, especially when Plaintiff has told the Defendant and her own doctors over and over again that on good days she can perform the types of menial tasks shown in the video. On bad days (which were not captured on video during the four days of surveillance because Plaintiff was unable to even leave her home) Plaintiff would not be able to do even the menial activity that was captured on video. Defendant is completely disingenuous if it claims otherwise.

In a remarkably similar case, the court in *Gessling v. Group Long Term Disability Plan for Employees of Srint/United Man. Co.*, --- F.Supp.2d ----. 2010 WL 933983 (S.D.Ind. 2010) recently held:

> The surveillance and interview observations do not provide reasonable, objective support for Hartford Life's decision. **The surveillance video shows Gessling engaged in less than nine minutes of minimal movement over the course of four days of observation. The investigators recorded Gessling walking to and from his car, bending over once, running a few errands, and gently wiping parts of his car dry after an automated car wash. Those observations were not inconsistent with Gessling's alleged limitations**. [Bold emphasis added].

Even if the Defendant's videotaped surveillance did contradict Plaintiff's self-reported limitations and impairments, and it does not, it still does not support Defendant's finding that Plaintiff is capable of performing the duties of her job on a full time basis. As the court stated in *Osbun v, Auburn Foundry, Inc.*, 293 F.Supp.2d 863, 870 (N.D.Ind. 2003):

> This leaves Auburn with only the surveillance tape to justify its decision. Admittedly, the tasks Osbun performs on the tape are inconsistent with Dr. Oo's description of his physical capabilities in her July 2000 report; for instance, Osbun drives a vehicle, continuously walks or stands for over an hour, bends, squats, and lifts objects that may weigh more than five pounds. However, evidence that Osbun can perform light physical tasks for 1.5 hours over two days falls far short of demonstrating that he is capable of sustaining a job. Auburn produced no evidence showing how long Osbun can perform such tasks, whether he can perform them on

a daily basis, or how much pain he must endure in the process. Rather, Auburn merely reviewed the videotape and drew the unsupported conclusion that Osbun's "ability to drive a vehicle, walk, stoop, lift, and carry heavy objects clearly demonstrates that he has the ability to perform jobs available in the economy." Auburn made no attempt to determine what those jobs are, what skills and abilities they require, or how the surveillance tape proves that Osbun possesses those skills and abilities.

Similarly it is a quantum leap to conclude that Plaintiff can perform the duties of her job eight

hours a day, five days a week, week in and week out simply because she can carry a one pound

box, walk from the car to her house, bend over once, and clear a path of snow powder the width of a

shovel so her pets can get in and out of the house, all in a period of time encompassing only a few

minutes and all of which occurred on one of Plaintiff's good days. As the court in *Osbun* stated at

871:

> In short, Auburn reached the conclusion that a mentally retarded, illiterate, partially blind, partially deaf, arthritic man with arteriosclerotic heart disease, thyroid insufficient, and high blood pressure, thyroid insufficiency, and high blood pressure **is capable of gainful employment, simply because he performed 1.5 hours of light physical tasks over the course of two days, and in spite of three medical reports finding total disability. This conclusion is "downright unreasonable," \* \* \* and thus its termination of Osbun's benefits was arbitrary and capricious.**

See also *Migliaro v. IMB Long-Term Disability Plan,* 231 F.Supp.2d 1167 (M.D.Fla. 2002) *and Linck*

*v. Arrow Electgronics, Inc.,* 2009 WL 2408411 (D.Md. 2009). [Bold emphasis added].

## D. IT IS ARBITRARY AND CAPRICIOUS FOR DEFENDANT TO IGNORE THE TOTALITY OF ALL PLAINTIFF'S MULTIPLE MEDICAL CONDITIONS AND, INSTEAD, FOCUS ON SEPARATE CONDITIONS IN ISOLATION.

In *Degennaro v. Liberty Life Assur. Co. of Boston,* 561 F.Supp.2d at 817, the court found

that an insurer's denial of a long-term disability claim was arbitrary and capricious, in part, for the

following reason:

> In each of his reports, Dr. Millstein addresses each condition separately, deferring to Dr. Bradley as to the effects of sleep apnea. His reports do not convey explicitly that he has considered the interactions among her conditions, which may well be greater than the sum of their parts. Liberty Life was aware of the need to consider her conditions cumulatively; it asked Dr. Millstein to do so. **But the record**

> **does not show that Dr. Millstein ultimately considered the totality of her conditions, nor does Liberty Life appear to have otherwise considered the cumulative impact of her conditions. Failure to consider the totality of Ms. DeGennaro's conditions weighs in favor of finding Liberty Life's decision to terminate her benefits arbitrary and capricious.** [Bold emphasis added].

See also *Maynor v. Hartford Life Group Ins. Co.,* 2009 WL 2601866 (E.D.Tenn 2009) [failure to consider the plaintiff's combined medical conditions and medications was arbitrary and capricious]; *Mood v. Prudential Ins. Co. of America,* 379 F.Supp.2d 267 (E.D.N.Y. 2005) [remand necessary to consider whether question of disability was considered in the context of the claimant as a whole person, including her obesity, age, education, and available jobs]; and *Lanier v. Metropolitan Life Ins. Co.,* 2010 WL 841178 at 10 **[claim denial was unreasonable when reviewing physicians failed to come to grips with the real problem, the whole person, and the history that corroborated complaints of pain].**

Since her grand mal seizure on January 4, 2006, Plaintiff has been diagnosed with serious, ongoing headaches, a seizure disorder, dizzy spells, inability to concentrate, lack of strength, inability to walk any significant distance, confusion, numbness in her extremities and face, pain while sleeping, sleep apnea, restless leg syndrome, scoliosis, severe back and leg pain from bulging discs, severe depression, anxiety, epilepsy, worsening scoliosis, and blindness in one eye, not to mention constant, debilitating pain leg and back for which Plaintiff has been prescribed narcotic pain medication, itself disabling because of its side effects. All of these conditions, disorders, and symptoms are detailed in the medical records of Plaintiff's treating physicians and all are documented by the administrative record that Defendant filed with the court.

Rather than consider their combined or cumulative effect on Plaintiff's ability to perform the material duties of her job, however, the Defendant simply considered a few of Plaintiff's medical problems on a piecemeal, individual basis. For example, Defendant separately considered Defendant's seizure disorder, concluded that it was controllable with medication, but never

considered Plaintiff's frequent complaints of falls and near falls, dizziness, and frequent headaches. AR 353-361. Defendant considered her back pain and determined that it was not disabling standing alone, but failed to consider her overall pain in the context of her ability to engage in full time work. *Id.* Defendant acknowledged, but then completely ignored, the fact that Plaintiff has good days and bad days – and concluded that because Plaintiff can engage in light activity on her good days she must not be totally disabled even though she is unable to even leave her house on her bad days. *Id.* Defendant's physician-reviewer concluded that Plaintiff does not suffer from any objective neurological deficit or any mental deficiency, yet ignores an abnormal EEG and a diagnosis of epilepsy, not to mention her numerous complaints of numbness, lack, of strength, difficulty in gait, fatigue, and the like. *Id.* A similar approach in analyzing the complaints of the insured was taken by the insurer in *Maynor v. Hartford Life Group Ins. Co.*, 2009 WL 2601866 at 10 causing the court to determine that the administrator acted arbitrarily and capriciously because "[n]o reviewer appears to have considered all the plaintiff's medical conditions in combination." For this reason alone the Defendant's decision to deny Plaintiff's claim is arbitrary and capricious.

## E. DEFENDANT'S FAILURE TO CONDUCT AN INVESTIGATION AND SEEK OUT INFORMATION NECESSARY FOR A FAIR AND ACCURATE ASSESSMENT OF THE CLAIM IS ARBITRARY AND CAPRICIOUS.

Following each of the two administrative appeals initiated by the Plaintiff, the Defendant performed no further investigation of Plaintiff's persistent claim that she is unable to perform the material duties of her job. Instead, the Defendant sent the Plaintiff's medical records to its own physician reviewer in an effort to elicit support for the denial of Plaintiff's benefit claim. Defendant made no attempt whatsoever to consider or analyze the conclusions arrived at by three different treating physicians, all of whom attested to Plaintiff's total disability and serious physical impairment. No effort was made to administer an independent medical exam or functional capacity exam to assess all of Plaintiff's afflictions and arrive at the truth of the matter involving Plaintiff's ability to

work. Instead, Defendant did nothing more than retain a physician reviewer to critique the Plaintiff's medical records for the purpose of showing that she was not disabled. These are not the actions of an impartial fiduciary seeking the truth of whether a disability claimant can perform the duties of her job on a full time basis.

Defendant's failure to investigate the new information Plaintiff furnished in each one of administrative appeals is arbitrary and capricious. As the Tenth Circuit held in *Rasenack*, 585 F.3d at 1324:

> Although the insured ultimately carries the burden of showing he is entitled to benefits, **the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim.** *See Gaither v. Aetna Life Ins.*, 394 F.3d 792, 807-08 (10th Cir, 2004). ("While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them."). As we made clear in *Gaither*: **"An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter."** *Id.* at 808. [Bold emphasis added].

This case presents a perfect setting for the application of the above holding. Dr. Narotzky, one of Plaintiff's treating physicians, diagnosed Plaintiff with white matter gliosis, small vessel disease, seizures, and numbness. AR 63. There is a plethora of information about white matter brain disease on various internet sites. It is a disease that results in the degeneration of white matter that creates a large portion of the brain.[1] This disease is specifically associated with motor problems and movement, such as muscle weakness, involuntary leg movements, loss of coordination, and restricted movement of the limbs. *Id.* Sensory problems also occur, such as tingling, loss of sensation, and experiencing pain without a cause. *Id.* Finally, white matter brain disease can interfere with cognitive functions such as memory problems, slow recall, depression, mood swings, anxiety, sleep disorders, and fatigue. *Id.* It has many of the same symptoms as multiple sclerosis and epilepsy. Is it not simply a coincidence that most of Plaintiff's symptoms and complaints may

---

[1] www.ehow.com/about_5124962_symptoms-white-matter-brain-disease.hmtl

also symptoms of white matter brain disease, the very same condition that Plaintiff was diagnosed with by Dr. Narotzky. Defendant did not bother to inquire further, even though Plaintiff specifically called the Defendant's attention to the white matter changes in her brain in her first appeal letter by stating that "[e]very doctor that has examined me and my medical records and films over the last 10 years have [sic[ told me that they are very concerned about the white matter changes in my brain." AR 11.

The Defendant, having been informed of this problem, should have investigated further to determine whether the white matter changes in Plaintiff's brain were the source of her problems. Instead, Defendant totally dismissed these concerns because Plaintiff was not yet "demented" and because medical records had not yet disclosed a demyelinating process (multiple sclerosis) in Plaintiff's brain. AR 357. It was much easier (and far more profitable) for Defendant to write off Plaintiff's symptoms as coming from an unreliable claimant than it was to investigate further. This claims conduct is arbitrary and capricious. As stated by the Tenth Circuit in *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (2004):

> **Rather, we assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refuse that theory.** [Citations omitted] [Bold emphasis added].

Again, "[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Id.* at 808. The Defendant was presented with just such a claim under the facts of the present case.

## F. IT WAS ARBITRARY AND CAPRICIOUS FOR DEFENDANT TO DENY PLAINTIFF'S BENEFIT CLAIM WITHOUT DETERMINING WHETHER SHE COULD PHYSICALLY AND MENTALLY PERFORM EACH OF THE MATERIAL AND SUBSTANTIAL DUTIES OF HER JOB.

Under the Defendant's benefit plan, an individual is deemed totally disabled when the Defendant determines that:

23

> You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury, and

> You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury. AR 412

While the Defendant paid lip service to the definition of total disability in its initial denial letter and two appeal letters, at no time did the Defendant ever actually determine whether sickness or injury prevented the Plaintiff from performing the material and substantial duties of her regular occupation as a paralegal and secretary. It is not sufficient for the Defendant to conclude that Plaintiff is physically capable of sedentary work without knowing what her specific job duties are. Without identifying those duties and determining whether the Plaintiff is physically and mentally able to perform those duties, there is no way the Defendant can conclude that Plaintiff is not totally disabled as that term is defined by the Plan.

The failure to determine whether a disability claimant can perform the material duties of his or her job before denying a claim for benefits is arbitrary and capricious. *Babish v. Sedgwick Claims Management Services, Inc.*, 2009 WL 563951 (W.D.Pa. 2009).

## CONCLUSION

The decision by the Defendant two deny Plaintiff''s claim for disability benefits is arbitrary and capricious. It was not predicated on a reasonable basis for all the reasons set forth above. *Adamson*, 455 F.3d at 1212. The decision was not supported by substantial evidence once all of the factors that detract from the weight of the evidence relied upon by Defendant to deny the claim are taken into account. *Sandoval*, 967 F.2d at 382. The Defendant exhibited egregious bad faith in its "cherry-picking" of evidence to support its claim denial. Defendant also acted in bad faith by refusing to consider all of the evidence supporting the Plaintiff's total disability. As demonstrated above, the Defendant's inherent conflict of interest clearly affected its claim decision because an

24

impartial fiduciary, for all the reasons expressed above, would not have dispensed with the claim in the same manner as the Defendant did.

The court, upon a finding that the denial of benefits was arbitrary and capricious, should reinstate coverage and order full payment of past benefits from March 16, 2006, the date the Plaintiff's disability began, because the decision to deny benefits was clearly arbitrary and capricious. *Caldwell*, 287 F.3d at 1289. Because of the arbitrary and capricious denial and the bad faith exhibited by Defendant, an award of attorney's fees, cost, and allowable interest is also proper pursuant to 29 U.S.C. §1132(g).

Dated this 16th day of April, 2010,

Respectfully submitted,

Pamela R. Goertz.
Plaintiff

BY:

Glenn E. Smith
Glenn E. Smith & Associates
216 Longs Peak Drive
Cheyenne, Wyoming 82009
(307) 635-4912

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiffs' Motion for Summary

Judgment was emailed to the following person this 16th day of April, 2010.

Maya Simmons
Alston & Bird, LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-33424

Glenn E. Smith