Maya Simmons
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Phone: (404) 881-7000

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

PAMELA GOERTZ     )
            ) Case No. 09-cv-236
   Plaintiff,     )
            )
v.            )
            )
THE PRUDENTIAL INSURANCE  )
COMPANY OF AMERICA,   )
            )
   Defendant.     )
_____)

## DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

   Defendants hereby RESPOND to Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") and SUPPORT Defendant's Motion for Summary Judgment ("Motion") pursuant to Fed. R. Civ. P. 56(c).

## INTRODUCTION

   By this action, Plaintiff Pamela Goertz seeks to recover benefits under an ERISA disability plan insured by a policy issued by Defendant Prudential Insurance Company of America ("Prudential") to Plaintiff's former employer.  For the reasons stated below, Plaintiff's claim is not only fatally flawed, but summary judgment for Prudential is required for two independent reasons.

   First, Plaintiff's action against Prudential is time-barred as a matter of law and undisputed fact.  The Plan specifically provides for a 3 year contractual limitations period for filing a lawsuit for benefits under the Plan.  Such contractual limitation periods are enforceable in the 10th Circuit.  *Salisbury v. Hartford Life & Accident Ins. Co.*, 583 F.3d 1245, 1248-1249 (10th Cir.

2009); *Moore v. Berg Enters.*, Case No. 98-4080, 1999 U.S. App. LEXIS 30481, 6-7 (10th Cir. 1999).   Under the plain terms of the Plan, the deadline for submitting proof of her claim was September 13, 2006, 180 days after Plaintiff's last day of work.   Plaintiff had 3 years from September 13, 2006, the time proof of her claim was required, to file a lawsuit challenging Prudential's decision.   Plaintiff did not file her lawsuit until October 16, 2009[1], more than a month after the contractual limitations period passed.

Second, even if Plaintiff had filed within the contractual limitations period, Prudential would still be entitled to summary judgment because the administrative record demonstrates that Prudential's determination that Plaintiff was not disabled was not arbitrary or capricious. Prudential's decision to deny long-term disability benefits was appropriate based on the administrative record and, at the very least, reasonable.   For all of these reasons and as more fully explained herein, Plaintiff's Motion should be denied and Defendant's Motion should be granted.

## THE UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

### I.   The Plan

Plaintiff Pamela Goertz was employed at Holme Roberts & Owen, LLP (the "Law Firm") as a legal secretary. (D0353[2].)   Disability benefits were provided through a plan sponsored by Holme Roberts & Owen, LLP and insured by Prudential under group policy number DG-91187-CO (the "Plan").   (D0442[3].)

---

[1] Plaintiff's Motion states that "Plaintiff initiated this action on September 15, 2009".   However, the docket shows that the Complaint was not filed until October 16, 2009.   (Doc No. 21 at p. 1; Doc. 1.)  Further, even if Plaintiff had filed her claim on September 15, 2009, her claim still would have been 2 days late based on the contractual limitations period.

[2] Submitted in support of Defendant's Motion is the declaration of Prudential Disability Claims Litigation Specialist Tamika Williams, authenticating the administrative record/claim file for Ms. Goertz, bates labeled as D0001-0391.   The relevant documents from the claim file are attached to Ms. William's declaration.   References to D#### herein are to the pages of the administrative record.

[3] Submitted in further support of Defendant's Motion is the declaration of Prudential Senior Contract Specialist – Group Insurance Contracts Jenny Coppola, authenticating the portion of the administrative record for Ms. Goertz containing the plan documents under which the Plan at issue in this litigation is administered.   The plan documents, bates labeled as D0392-0401 and D0441-0479, are attached to Ms. Coppola's declaration.

Under the terms of the Plan, a participant is entitled to long-term disability benefits when "Prudential determines" that:

> • The participant is unable to perform the material and substantial duties of his/her regular occupation due to sickness or injury; and
> • The participant has a 20% or more loss in indexed monthly earnings due to the sickness or injury.

(D0451.) After 24 months of payments, the participant is disabled when Prudential determines that due to the same sickness or injury, the participant is unable to perform the duties of any gainful occupation for which they are reasonably fitted by education, training or experience. (*Id*.)

The Plan pays 60% of a participant's monthly earnings with a maximum monthly payment of $10,000 reduced by deductible sources of income. (D0452.) Benefits are payable to normal retirement age as defined by the Social Security Act (which, for Plaintiff, is age 66, which she will turn on September 21, 2015). (D0458.) Benefits may be reduced by other sources of income, including Social Security disability payments. (D0455-56.) The Plan also contains a 24-month limitation on disabilities from mental illness. (D0459.) Disabilities that are determined "by Prudential" to be "due in whole or part to mental illness" have a limited pay period of 24 months[4]. (*Id.*)

Under the Plan terms, disability benefits begin when Prudential determines a participant is eligible and will stop on "the date the participant fails to submit proof of continuing disability satisfactory to Prudential." (D0452, D0458) Further, the summary plan description states that Prudential "has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." (D0475.)

The Plan specifically states that a "[participant] can start legal action regarding [their] claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim

---

[4] If the Court was to find that Prudential's disability decision was arbitrary or capricious (which it should not for the reasons explained herein), Plaintiff may only be entitled to 24 months of payments as Plaintiff specifically states that she suffers from "severe depression" and anxiety. (Doc. No. 21 at pp. 3-4.) Under the recent decision by the Supreme Court in *Conkright v. Frommert*, Case No. 08-810, 2010 U.S. LEXIS 3479 (U.S. Apr. 21, 2010), if this Court were to find Defendant was incorrect in determining that Plaintiff was not disabled, the Court should

is required, unless otherwise provided under federal law." (D0465.)  "Written notice of a claim should be sent within 30 days after the date [their] disability begins.  However, [they] must send Prudential written proof of [their] claim no later than 90 days after [their] elimination period ends.  If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity." (D0464.)  The elimination period is 90 days and is defined as the period of continuous disability which must be satisfied before the participant is eligible to receive benefits from Prudential.  (D0442, D0452.)

## II.      **Plaintiff's Medical History**

Plaintiff suffered a seizure at work in January 2006.  (D0052.)  Anna Cosyleon, her internist, diagnosed her with seizure disorder and depression in June 2006.  (*Id.*)  Thereafter, according to the administrative record, Plaintiff was treated primarily by Dr. Ginsberg, and Dr. Narotzky beginning in 2006.

### A.      **Dr. Stanley Ginsburg**

According to the administrative record, Dr. Ginsberg, her treating Neurologist, began seeing Plaintiff as early as March 2006.  (D0300.)  Over the course of her treatment with Dr. Ginsburg, Plaintiff complained of various ailments that were unsupported by medical exams and tests.  (*Id.*)  For instance, while Plaintiff reported that she could not walk without assistance, a physical exam revealed her gait was normal.   (D0371.)  During a later office visit, Plaintiff refused Dr. Ginsburg's request that she walk without her walker so that he could observe her gait. (D00207.)

Dr. Ginsburg notes that Plaintiff rejected any suggestion that she might have some depression and anxiety.   (D0162.)   He also noted that she did not have an underlying inflammatory disease, that her spinal fluid was normal, and that despite not having another seizure since the one in January 2006, Plaintiff complained of feeling bad.  (*Id.*)  Dr. Ginsburg opined that Plaintiff could return to work in April of 2006, but in June of 2006, he opined that she could not work without providing any information as to what changed – outside of Plaintiff's own self-reported complaints.  (D0371-72, D0383.)

---

remand this matter to the Claims Administrator (Prudential) for a determination of the amount of benefits due under the terms of the Plan.

LEGAL02/31818314v2

On March 20, 2006, Dr. Ginsburg notes that Plaintiff's self-reported symptoms are not supported by any diagnosis and states that he cannot explain why the Plaintiff is experiencing certain symptoms.  (D0221.)  Dr. Ginsburg also ruled out multiple sclerosis as a possible cause of her pain.  (D0160.)  In October of 2006, Dr. Ginsburg referred Plaintiff to Dr. John Corboy, a Neurologist with a specialty in multiple sclerosis, because Plaintiff wanted a second opinion. (D0010.)  However, Dr. Corboy also determined that Plaintiff did not have multiple sclerosis. (D0126.)

**B.     Dr. Robert Narotzky**

On October 11, 2006, Plaintiff began seeing a neurosurgeon, Dr. Narotzky, who had treated her in the past.  (D0011.)  An attending physician statement dated February 5, 2007, from Dr. Narotzky states that a brain biopsy was performed on December 26, 2006, which revealed white matter gliosis and small vessel disease.  (D0127.)  While he states on February 2007, that Plaintiff is totally disabled, Dr. Narotzky's evaluation contradicts itself.  (D0063.)  First he checks the box stating Plaintiff is able to function under stress and engage in interpersonal relations with no limitations, and then later he indicates without explanation that she is incapable of tasks and the stress of her position.  (*Id.*)

**C.     Other Medical Records**

Plaintiff's medical records also include Dr. William Kubaska's attending physician statement from September 13, 2006.  (D0021-22.)  While Dr. Kubaska opines that Plaintiff is totally disabled, he does not explain his reason for concluding Plaintiff is disabled.  (*Id.*)  In the space provided for an explanation, Dr. Kubaska's fails to provide an explanation, choosing instead to list symptoms and/or tests without discussing the cause of those symptoms or the results of those tests.  (*Id.*)

On November 6, 2006 a Psychological Evaluation was taken on behalf of the Social Security Administration ("SSA") in connection with Plaintiff's claim for disability benefits by Amy Crockett, PhD.  (D0119.)  Plaintiff's Physical Residual Functional Capacity Assessment results were reported in the evaluation and showed that Plaintiff has a GAF of 55 to 50, which would make her capable of working.  (*Id.*)   Further, the evaluation noted that Plaintiff had the "cognitive ability to learn and retain information for several work-related tasks".  (*Id.*)

### III.   Plaintiff's Claim History

#### A.      Plaintiff's Initial Claim

Plaintiff initiated her claim for disability benefits under the Plan on or around June 20, 2006, by submitting the "Employee Statement" form, where she specifically identifies her last day of work as March 16, 2006.  (D0036-37.)

In a letter dated July 25, 2006, Prudential informed Plaintiff that more information was needed before her claim could be decided.  (D0389-90.)   In the letter, Prudential asked Plaintiff to provide more information to support her claim, including medical records and a copy of her job description. (D0390.)  On August 14, 2006, Prudential again requested more medical records from the Plaintiff.  (D0385.)  Plaintiff subsequently submitted various medical records and information as described above.

#### B.      Prudential's Initial Denial

On September 6, 2006, Prudential denied Plaintiff's claim because it was determined that Plaintiff's medical records beyond April 24, 2006, did not support a determination that she was impaired to the point that she could not perform her occupation as a legal secretary.  (D0382-83.) Prudential provided several reasons for its decision to disallow benefits including: (1) the April 7, 2006 physical exam notes reporting that the Plaintiff was "walking normally with excellent strength in [her] upper extremities," (2) the May 01, 2006 physical exam which did not show any neurological deficits and noted disk bulges but did not note any significant canal stenosis or disc herniations, (3) Plaintiff's symptoms of tenderness and restricted range of motion would not preclude Plaintiff from performing her occupation, and (4) the July 31, 2006 office note which reported that the Plaintiff's issues with balancing her checkbook was not a factor of concentration or mental ability, but was due to insufficient funds.  (D0383.)  Additionally, the letter informed Plaintiff of her appeal rights under the Plan and invited Plaintiff to submit any information related to her claim with her appeal, if she chose to appeal. (D0383-84.)

#### C.      Plaintiff's Initial Appeal

Plaintiff appealed the denial on October 26, 2006.  (D0009-12.)  The basis of Plaintiff's appeal was that because of unspecified "health issues," she could not perform her duties as a legal secretary, which she described as including activities such as constant computer work, organizing files and calendars, arranging meetings, completing documents for filing, and

timekeeping for attorneys.  (D0009.)  In the appeal letter, Plaintiff stated that she was "barely able to handle [her] own life," that she didn't walk well resulting in "numerous falls and near falls," and that she "[could] not lift or carry *anything*."  (D0010.) (emphasis added)  Plaintiff also attempted to discredit the medical opinions of Dr. John Corboy, claiming that it was clear that he decided Plaintiff did not have multiple sclerosis ("MS") before he met Plaintiff based on conversations with Dr. Stanley Ginsberg.  (D0011.)  Notably, Plaintiff admitted that her sleep apnea was being treated with CPAP and that her seizures were being effectively controlled with Keppra.  (*Id.*)  In fact, Plaintiff stated that she had "not experienced another Grand Mall Seizure" since she began taking Keppra.  (*Id.*)  As a part of her appeal, Plaintiff also submitted additional medical records as discussed above.  (*Id.*)

In a letter dated November 2, 2006, Prudential informed the Plaintiff that more information was needed to complete the appeal review.  (D0377.)  The letter also stated that Prudential, as a matter of customer service, had requested medical records from Dr. Narotzky, but that the responsibility for providing proof of disability was still Plaintiff's.  (D0378.)

On December 8, 2006, Prudential sent Plaintiff a letter to notify her of their receipt of the medical records from Dr. Narotzky and to let her know more time was needed to review her appeal.  (D0376.)

### D.   The Surveillance Video

In an effort to reconcile Plaintiff's self-reported symptoms with her medical records that questioned the veracity of same, Prudential hired independent private investigators to conduct surveillance on the Plaintiff during November, 2006.  (D0014-18.)  The surveillance report shows Plaintiff driving, carrying items to and from her car, bending, shoveling snow, walking, and standing.  (*Id.*)  Plaintiff claims the surveillance report does not prove anything because she has good days, and has informed her doctors "over and over again that on good days she can perform the menial tasks shown in the video."  (Doc. No. 21 at p. 18.)  Yet, the administrative record does not contain even a single reference or instance where she told her doctors that on occasion she can perform tasks similar to those shown on the video.  (*Id.*)

More notably, Plaintiff's first appeal letter *never* mentions that Plaintiff has good days and bad days.  (D0009-12.)  Instead, Plaintiff describes her pain and symptoms as "constant".  (D0011.)  In the first denial letter, Plaintiff claims that due to her impaired ability to walk, she

- 7 -

has "had numerous falls and near falls, and because of this, [she] cannot lift or carry anything." (D0010.)  It is not until Plaintiff is made aware of the video surveillance that she claims she has goods days on which she is capable of doing these things.  (D0085.)

**E.      The Neurological Independent Medical Review**

On January 2, 2007, Plaintiff's medical records were reviewed by Dr. Michael Partnow, who is board certified in Neurology.  (D0052-56.)  Dr. Partnow opined that Plaintiff had no functional impairment from March 17, 2006, forward.  (D0054.)  He noted that all of Plaintiff's exams were essentially normal and that the exam findings were inconsistent with Plaintiff's self-reported complaints.  (*Id.*)  Dr. Partnow also noted that he did not find support in Plaintiff's medical records for any restrictions or limitations regarding Plaintiff's ability to sit, stand, walk, lift, reach, carry, or drive.  (*Id.*)    Dr. Partnow pointed out that the Plaintiff had not been diagnosed with a definite deficit or diagnosis.  (*Id.*)  Notably, Dr. Partnow noted that Dr. Ginsberg's medical records did not address the Plaintiff's reported chronic pain and noted that Plaintiff's claims of chronic headaches and neck pain were not severe enough to be disabling. (D0055.)

While Dr. Partnow noted that the Plaintiff may have seizure disorder, he specifically stated that seizure disorder did not prevent people from working.  (*Id.*)  He stated that Plaintiff's self-reported symptoms were not supported by any objective evidence and were contradicted by the surveillance tapes.  (D0055.)  Dr. Partnow pointed out that the white matter revealed by the MRI is a frequent finding and that it had not resulted in a definite diagnosis for Plaintiff.  (*Id.*) As such Dr. Partnow opined that Plaintiff was not functionally impaired.  (*Id.*)

**F.      Prudential's Denial of Plaintiff's Appeal**

Prudential denied Plaintiff's appeal on January 17, 2007, after it was determined that the initial decision to deny benefits was appropriate.  (D0368.)  In the denial letter, Prudential informed Plaintiff of its reasons for denial.  (*Id.*)    Prudential stated that the surveillance report was "in stark contrast to [Plaintiff's] self-reported limitations and impairments and render[ed] such complaints of [Plaintiff's] as unreliable and clearly lacking credibility."  (D0369.)  Further, Prudential explained its decision by stating that:

> All of your physical examinations were essentially normal. Various inconsistencies exist between your examination findings and your self-reported complaints. There are several instances of your physicians raising concerns that

> there is no definite diagnosis regarding neither the seizure disorder nor your various complaints of numbness, weakness and gait difficulty.  Your gait was always normal or only minimally abnormal upon examination.  Your complaints of cognitive impairment were never confirmed on physical examination.  Your diagnostic studies were reported as normal except for non-specific brain MRI findings of diffuse white matter changes.  Your EEG was non-specific for left temporal lobe abnormalities.

(D0372.)  Prudential also noted:

> Dr. Ginsburg was ready to release you to return to work when you complained that your cognitive skills and your gait disorder rendered your returning to work impossible. A review of your examinations never documents such abnormalities so as to conclude that you were functionally impaired. The surveillance completed on appeal correlates with your clinical results. Under surveillance, you are seen walking without gait disturbances, clearing snow without unsteadiness, you were not observed using a walker to ambulate, and were not observed to have fallen or list in any direction.

(*Id.*)   Taking into consideration all of the evidence, Prudential determined that Plaintiff did not meet the policy's definition of disability and upheld its decision to terminate benefits.  The letter then informed Plaintiff of her right to initiate a lawsuit.  (D0373.)

### G.    Plaintiff's Second Appeal

Plaintiff submitted a second appeal on March 8, 2007.  (D0081-87.)   In her second appeal, Plaintiff attempted to discredit Dr. Ginsberg, claiming he is "quite elderly," that his "clinical notes contain many inaccuracies and omissions," and implies that Dr. Ginsberg treated her poorly.  (D0081-82.)  Plaintiff then goes on to suggest that the blame for the discrepancies between her claims and Dr. Ginsberg's medical records should be held against Dr. Ginsberg.  (D0082.)   Finally, Plaintiff attempted to rationalize her noncompliance with Dr. Ginsberg's request that she walk without her walker and suggested that all of the doctors Dr. Ginsberg referred her to were all in on a conspiracy to improperly diagnose her because none of them came up with the diagnoses she wanted.  (D0083.)   In addition to her letter, Plaintiff also submitted additional medical records with her second appeal as summarized above.  (D0086.)

### H.    The  Psychological Independent Medical Review

On March 27, 2007, Dr. Matthew Carroll, who is board certified in Psychiatry, reviewed Plaintiff's medical record.  (D0118.)  He opined that Plaintiff's medical records did not support psychological and/or cognitive impairment from March 17, 2006, forward.  (D0120.)  He noted that while Plaintiff complained of memory problems and confusion, the only psychological

- 9 -

examination in Plaintiff's medical records were from the SSA's examination – which he described as "relatively cursory". (*Id.*) Dr. Carroll stated that Plaintiff's mental status examination was essentially normal. (*Id.*) He also noted that the psychologist's notes were based solely on Plaintiff's self-reported history and that there were no evaluation findings to support Plaintiff's claims. (*Id.*) Dr. Carroll pointed out that Plaintiff did not receive any psychological or neuropsychological testing. (D0121.) He opined that if Plaintiff's treating physicians were really concerned with Plaintiff's cognitive and memory problems, more formal testing would have been conducted. (*Id.*) He noted that while Plaintiff's medicines could cause adverse side effects, no such side effects were noted or recorded in Plaintiff's medical records. (*Id.*) Dr. Carroll stated that it was unclear why the Plaintiff was taking all the medications she was on and what they were prescribed to treat. (D0122.) Dr. Carroll opined that Plaintiff's records were inconsistent with someone who had a history of depression and anxiety. (*Id.*) Further, he pointed out that Plaintiff does not have any psychiatric medical records. (*Id.*) He concluded that there were no objective findings of cognitive or memory problems and that there were no findings of indicative of any impairment. (*Id.*)

### I.      The Follow-up Neurological Independent Medical Review

On March 21, 2007, Dr. Partnow performed a second review of Plaintiff's medical records to consider the additional evidence Plaintiff submitted with her second appeal. (D0125-28.) As such, he reviewed the psychology evaluation performed on November 6, 2006, on behalf of the SSA. (D0127.) Dr. Partnow's review of Dr. Crockett's psychology report was limited as he pointed out his lack of expertise in the area. However, he concluded that Dr. Crockett's comments appeared to be based on Plaintiff's self-reported complaints and not objective test results. (D0128.) Dr. Partnow opined that the additional records did not alter his prior assessment, noting that there was "no objective neurological deficit" and her diagnosis of epilepsy was unconfirmed. (*Id.*)

### J.      Prudential's Denial of Plaintiff's Second Appeal

Prudential denied Plaintiff's second appeal on April 5, 2007. (D0353-61.) In the denial letter, Prudential thoroughly explained the reasons for their decision. (*Id.*) Prudential basically went through Plaintiff's medical history and stated the reasons why the medical history did not

support Plaintiff's claim that she was disabled.  (*Id.*)  Some of the key points highlighted by Prudential were:

(1)     "In July 2006, a 48-hour EEG was reported as showing a left temporal area of focal slowing and sharp wave activity, but no clear clinical correlation with any symptom and the study was thought to be diagnostic of epilepsy;" (D0355.)

(2)     Plaintiff was evaluated in October 2006 for MS and both Dr. Ginsburg and Dr. Corboy stated that Plaintiff do not have MS;  (*Id.*)

(3)     In October 2006, Dr. Narotzky "noted on examination an unsteady Romberg, but otherwise [noted that Plaintiff was] neurologically intact with normal mental status;"  (*Id.*)

(4)     On January 19, 2007, Dr. Narotzky "advised one aspirin per day" for the white matter gilisosi and limited small vessel disease; and (D0357.)

(5)     "The brain biopsy was an aggressive approach to diagnosis and confirms that the white matter findings are non-specific and not diagnostic. Specifically, no specific vascular disease, no specific dementing disease, and no sign of MS were found on the brain biopsy. The biopsy showed no evidence of an impairing condition."  (D0358.)

As such, Prudential upheld its prior decision to disallow benefits.  (D0360.)

## ARGUMENT AND CITATION OF AUTHORITY

## I.     The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it

bears the ultimate burden of proof.  *Id.* at 322-23.  If the moving party meets their burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by their own affidavits, or by the "depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  If the non-moving party fails to do so, the moving party is entitled to summary judgment.  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991).

**II.**      **Plaintiff's Claim Is Barred By The Contractual Limitations Period**

Plaintiff's action against Prudential is fatally late.  The Plan language specifically provides for a 3 year contractual limitations period for filing a lawsuit for benefits under the Plan.  Contractual limitation periods are enforceable in the 10th circuit.  *Salisbury v. Hartford Life & Accident Ins. Co.*, 583 F.3d 1245, 1248-1249 (10th Cir. 2009); *Moore v. Berg Enters.*, Case No. No. 98-4080, 1999 U.S. App. LEXIS 30481, 6-7 (10th Cir. 1999).  In fact, several other circuit courts have held that reasonable ERISA-plan limitations periods are enforceable. *See id.; Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 302 (6th Cir. 2006); *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 337 (5th Cir. 2005); *Wilkins v. Hartford Life & Accident Ins. Co.*, 299 F.3d 945, 948 (8th Cir. 2002); *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 875 (7th Cir. 1997).  The contractual limitation period, as outlined in the Plan is reasonable based on the precedent. *Salisbury*, 583 F.3d at 1247-1248 (finding a similar 3 year limitations period reasonable and rejecting Plaintiff's claims that the limitations period was unenforceable because the Plan language was ambiguous and confusing where the Plan stated "[l]egal action cannot be taken against us: 1. sooner than 60 days after Proof of Loss has been furnished; or 2. three years after the time written Proof of Loss is required to be furnished according to the terms of the Policy.")

According to the Plan terms, Plaintiff could have initiated legal action 60 days after proof of her claim was given and up to 3 years from the time proof of her claim was required. (D0465.)  Plaintiff was required to submit proof of her claim no later than 90 days after the elimination period, which she did.  (D0136-37; D0464.)  Her first day out of work was March 17, 2006, and the elimination period was 90 days.  (Doc. No. 21 at p. 2; D0136, D0442.) Accordingly, the elimination period ended on June 15, 2006 – 90 days after March 17, 2006. Plaintiff had 90 days after the elimination period ended to submit proof of her claim. Therefore,

- 12 -

the cut-off date for submitting proof of her claim was September 13, 2006 – 90 days after June 15, 2006.  Plaintiff had 3 years from September 13, 2006, the time proof of claim was required, to file a lawsuit challenging Prudential's decision. Plaintiff did not file her lawsuit until October 16, 2009; more than a month after the contractual limitations period passed (and almost two years after Prudential's final appeal decision).[5]

As such, judgment should be entered in favor of Prudential and Plaintiff's case dismissed as time-barred.

## III.    The Arbitrary & Capricious Standard of Review Applies

Where an ERISA plan grants the administrator discretionary authority to determine eligibility for benefits, the court employs "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."  *Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1361 (10th Cir. 2009) (quotation omitted).   Under the arbitrary and capricious standard of review, Prudential's decision "need not be the only logical one nor even the best one."  *Kimber v. Thiokol*, 196 F.3d 1092, 1098 (10th Cir. 1999).   Instead, the Court asks "whether the administrator's decision was reasonable and made in good faith," *Phelan v. Wyoming Associated Builders*, 574 F.3d 1250, 1256 (2009) (quotation omitted), and whether the decision is supported by substantial evidence.  *See Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).  Substantial evidence has recently been defined in the Tenth Circuit as less than a preponderance, but more than a scintilla.  *Adamson*, 455 F.3d at 1212.  As the Tenth Circuit explained, "[t]he reviewing court need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness – even if on the low end." *Kimber*, 196 F.3d at 1098 (10th Cir. 1999)

---

[5] Plaintiff may argue that the contractual limitations period was tolled during Plaintiff's appeal. However, this argument has been rejected by 10th Circuit Courts where, as in this case, the defendant did not prevent plaintiff from filing suit within the contractual limitations period. *See e.g. Salisbury*, 583 F.3d at 1245 (enforcing the contractual limitations period even though time began accruing before the administrative appeal process ended); *Moore v. Berg Enters*., 1999 U.S. App. LEXIS 30481, at *7 (10th Cir. 1999) (finding "no merit to [plaintiff's] argument that the contractual limitations period was tolled or rendered inapplicable by [the administrator's] offer to re-review [plaintiff's] claim).  Thus, any requests that tolling be applied to Plaintiff's claim must be denied.

In this case, the applicable Plan provides that participants are entitled to disability benefits only "when Prudential determines" that all of the requisite criteria has been satisfied. (D0451.)  The Plan further provides that disability benefits end on "the date the participant fails to submit proof of continuing disability satisfactory to Prudential." (D0458.) This language grants sufficient discretion to Prudential for the arbitrary and capricious standard to apply. *See e.g. McGraw v. Prudential Ins. Co. of Am.,* 137 F.3d 1253, 1259 (10th Cir. 1998) (when a "plan states that the grant or denial of a particular benefit is to be determined by proof satisfactory to the administrator, . . . deferential review is proper"); *Benson v. Prudential Fin., Inc.*, No. 07-587, 2008 WL 6034961 at *10 (D.N.M. July 09, 2008) ("You are disabled when Prudential determines that certain conditions are met" justified arbitrary and capricious standard of review) (internal quotation marks omitted); *Landheim v. Prudential Ins. Co. of Am.*, No. 04-761, 2006 WL 978715 at *5 (D. Utah Apr. 11, 2006) (reasoning that it was "settled" in the Tenth Circuit that language identical to that in the Plan here justifies a deferential standard of review). *See also Roach v. Prudential Ins. Brokerage, Inc*., 62 Fed. Appx. 294, 296, 299 (10th Cir. 2003) (parties did not dispute that deferential standard applied; "when Prudential determines" was only language discussed).[6]

Although Plaintiff concedes that there is sufficient discretionary language; Plaintiff argues that the amount of deference allowed under the arbitrary and capricious standard of review should be reduced because Prudential is a "conflicted fiduciary". (Doc. No. 21 at pp. 9-10.)  When a plan administrator "both evaluates claims for benefits and pays benefits claims," there is an inherent conflict of interest, which "should be weighed as a factor in determining whether there is an abuse of discretion," Metropolitan Life Ins. Co. v. Glenn, __ U.S. __, 128 S. Ct. 2343, 2348-50 (2008).  To the extent a structural conflict exists, it does not reduce the level

---

[6] Further, the language in the SPD granting Prudential "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits" and stating that "[t]he decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." (D0475) also justifies application of the arbitrary and capricious standard of review.  *See Tinkler v. Level 3 Comms., LLC*, No. 07-259, 2008 WL 199901 at *10 (N.D. Okla. Jan. 22, 2008) (deferential standard applies when SPD grants discretion); *Alves v. Silverado Foods, Inc.*, 6 Fed. Appx. 694, 700 (10th Cir. 2001) (the district court determined the plan's SPD did grant the administrator such discretionary authority and applied the arbitrary and capricious standard" and the decision was not challenged on appeal).

of deference that applies to Prudential's decision; instead, it is one of many factors the Court considers. *Glenn,* 128 S. Ct. at 2351; *Hancock v. Metropolitan Life Ins. C*o., 590 F.3d 1141, 1155 (10th Cir. 2009) (when weighing a conflict of interest, the conflict "affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal.")

Moreover, any conflict of interest concern is belied by a review of the record, which shows a thorough and thoughtful analysis of the complete file and well-reasoned decision making. Plaintiff fails to establish that the conflict actually affected Prudential's review in any way. Aside from Plaintiff's obvious disagreement with the claim decision, her criticisms of the claim process rests on a number of inaccurate characterizations of the record. Accordingly, any alleged "conflict of interest" does not reduce the level of deference owed Prudential under the arbitrary and capricious standard of review, especially in light of the evidence supporting Prudential's decision.

**IV.   Prudential's Decision was not Arbitrary and Capricious**

**A.   Plaintiff Attempts to Impose Unlawful Burdens on Prudential in its Claims Appeal Process and Decision**

Notwithstanding Plaintiff's arguments, Prudential's decision was reasonable and should be upheld under the arbitrary and capricious standard of review. *Kimber,* 196 F.3d at 1098 (10th Cir. 1999) ("[t]he reviewing court need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness – even if on the low end.) Prudential thoroughly reviewed Plaintiff's claim file and did not ignore any of the medical records or other evidence in Plaintiff's file.

**1.   Prudential Does Not Have to Discuss and Refute Every Statement in the Medical Records**

Although Plaintiff implies otherwise, Prudential is not obligated to specifically address every document in the administrative record in its denial letters. (Doc. No. 21 at pp. 11-12.) *See e.g. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) (finding that courts cannot "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation"); *Waugh v. Williams Cos*., Case No. 07-CV-0446-CVE-SAJ, 2008 U.S. Dist. LEXIS 49237, 43-46 (N.D. Okla. June 27, 2008); *Kent v. United of Omaha Life Ins. Co*., 96 F.3d 803,

807 (6th Cir. 1996) (to comply with the requirements of ERISA the insurer needs only put the claimant on notice of the reasons for the denial of the claim).

### 2.     No Independent Medical Exam is Required

Plaintiff again tries to impose unwarranted obligations on Prudential by claiming Prudential should have conducted an Independent Medical Exam (IME), rather than the three Independent Medical Reviews (IMR) it did conduct.  (Document No. 21 at pp. 17, 21-22.)  As a matter of law, however, *Prudential is not* required to conduct an Independent Medical Exam.[7] (Document No. 21, pp. 5, 13, 21-22; D0451 ("We *may* require you to be examined by doctors, other medical practitioners or vocational experts of our choice.") (emphasis added); *Waugh*, 2008 U.S. Dist. LEXIS 49237 at *49 ("neither ERISA nor the terms of the Plan require in-person medical examinations or peer-to-peer consultations with treating physicians")).    Thus, Prudential's decision to rely on IMRs instead of an IME does not make Prudential's benefit determination arbitrary and capricious.

### 3.     Prudential's Process was Reasonable and not Arbitrary or Capricious

Prudential's decision was reasonable for several reasons.  First, Prudential properly engaged qualified independent physicians to perform the IMRs discussed above.  The IMRs were properly performed, and Prudential properly weighed the evidence in the administrative record. Second, the surveillance video shows Plaintiff engaging in activities she states she cannot perform, and Plaintiff's attempts to discredit the surveillance video are a transparent attempt to save her claim and avoid insurance fraud charges.  Third, Prudential is not bound by the determination of the SSA.

---

[7] Plaintiff claims the purpose of the IME is to provide diagnostic testing, i.e. objective medical evidence.  (Doc. No. 21 at p. 17.)  However, the Plan does not state that this is the purpose of Prudential reserving the right to use IMEs.  (D0451.)  Thus, Plaintiff's claims are an assumption unsupported by any facts, knowledge, or evidence.  Further, Plaintiff admits that Plaintiff's claim was denied "in part because of the absence of diagnostic testing to confirm numerous complaints registered by Plaintiff."  (Doc. No. 21 at p. 7.)  Ironically, Plaintiff essentially blames Prudential for the lack of objective medical evidence in Plaintiff's file, despite clear Plan language that it is Plaintiff's responsibility to provide proof of her claim at her own expense.  (Doc. No. 21 at p. 17; D0464.)  Plaintiff even implies Dr. Partnow was wrong for not assuming Plaintiff experienced the side effects of her medicine when the medical records never mentioned Plaintiff suffering from any side effects.  (Doc. No. 21 at p. 3.)

- 16 -

**B.** **The Independent Medical Review was Properly Performed and Prudential Properly Considered the Evidence Presented in the Administrative Record**

Prudential had two independent medical doctors review the Plaintiff's medical records. They both determined that the Plaintiff was not disabled and fully capable of performing her job duties as a legal secretary. Plaintiff erroneously claims they were Prudential's "own physician reviewer[s]", however this is completely false. (Doc. No. 21 at pp. 11, 21.) Prudential hired these independent doctors through MLS National Medical Evaluation Services, Inc. and MES Solutions. (D0052, D0118, D0125.)

The independent reviewers were both provided with Plaintiff's complete claim file and reviewed all of the information in Plaintiff's claim file. (D0052-56, D0118-23, D0125-128.) Although Plaintiff claims that Dr. Partnow completely ignored the opinions of Plaintiff's treating physicians, she later notes that Dr. Partnow quoted and discussed the findings and records from Plaintiff's treating physicians. (Doc. No. 21 at pp. 11-12.) Plaintiff's bi-polar claims are inconsistent with the record. (*Id.*)

In reality, Dr. Partnow's report clearly shows that not only did he review Plaintiff's treating physicians' records, he analyzed them and reconciled them. (D0052-56, D0125-28.) For example, Dr. Partnow summarizes Plaintiff's medical history. (D0052-53, D0125-27) He then goes on to explain why he does not think Plaintiff has any functional impairment citing specific test results, the lack of objective medical evidence, and pointing out that the conclusions of Plaintiff's treating physicians are unsupported by medical records. (D0054-55, D0127-28.)

Plaintiff attempts to discredit Dr. Partnow's report because he did not call Plaintiff's treating physicians; however, that is also not required under ERISA. (Doc. No. 21 at pp. 12-13; *Waugh*, 2008 U.S. Dist. LEXIS 49237 at *49 ("neither ERISA nor the terms of the Plan require … peer-to-peer consultations with treating physicians"). Further, Plaintiff completely ignores the report of the second independent medical reviewer. (D0118-23.) Dr. Carroll's report also summarized Plaintiff's medical history and then explained exactly why Plaintiff's medical records do not support a finding of impairment. (*Id.*)

While Prudential may not arbitrarily refuse to credit the Plaintiff's treating physicians, Prudential is not required to accord them any special weight. *Black & Decker*, 538 U.S. at 834. Further, Prudential is not required to disregard the opinions of the independent medical reviewers

simply because their opinions are different than those of Plaintiff's treating physicians. *See e.g. Waugh*, 2008 U.S. Dist. LEXIS 49237 at *45 (Finding that "[w]hile the Plan's decision should and did take into account the opinions of plaintiff's treating physicians, the Plan also considered the opinions of the four reviewing doctors, who all concluded that the record contained insufficient objective medical evidence to support a finding of "Total Disability."") Here Prudential did consider the opinions of Plaintiff's treating physicians. However, Prudential determined that Plaintiff's treating physicians' medical records were inconsistent, as noted above.

Plaintiff's diagnostic studies were reported as normal except for non-specific brain MRI findings of diffuse white matter changes - which Plaintiff claims Prudential should have been able to diagnose as "white matter brain disease,"[8] despite Plaintiff's treating physician's inability to diagnose her with the same. (Doc. No. 21 at p. 22.) Plaintiff claims Dr. Narotzky diagnosed her with "white matter brain disease" but fails to cite the diagnosis. (Doc. No. 21 at p. 23.) Thus, Prudential had no reason to know "white matter brain disease" was an issue that needed to be looked into, especially since the neither Plaintiff's treating physicians or the Independent Medical Reviewers ever mentioned "white matter brain disease". *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325 (10th Cir. Colo. 2009) ("Nothing in ERISA requires plan administrators to go fishing for evidence when it has not been brought to their attention that such evidence exists.") (citing *Gaither v. Aetna Life Ins.*, 394 F.3d 792, 804 (10th Cir. 2004).

Moreover, Prudential considered all of Plaintiff's illnesses in their totality, not separately as Plaintiff claims. (Doc. No. 21 at pp. 19-20.) There is nothing in the record that indicates that Prudential did not consider the combined effect of Plaintiff's symptoms and conditions. Thus, the independent medical reviews were reliable and Prudential did not act arbitrarily or capriciously by relying on the independent medical reviewers' reports when making their decision. *See e.g. Chalker v. Raytheon Co.*, 291 Fed. Appx. 138, 143-44 (10th Cir. 2008) (it was not arbitrary and capricious for insurer to credit the reports of reviewing physicians rather than

---

[8] Plaintiff cites to the website www.ehow.com, to support her claims regarding the ease of finding information on the white matter on Plaintiff's brain. (Doc. No. 21 at p. 22.) However, this information is not in the administrative record; therefore, Plaintiff cannot present this information to the Court. *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609 (6th Cir. 1998) (courts should exclude from its review evidence that was not in the administrative record)

the reports of treating physicians and noting that insurers do not "owe the opinions of [treating physicians] any special deference"); *Waugh*, 2008 U.S. Dist. LEXIS 49237 at *48 (Finding "the peer reviewing doctors clearly stated the primary reason for their conclusions: There was no current objective medical documentation showing that plaintiff could not perform any occupation for which she was qualified," and therefore their reports were reliable and supported by substantial evidence.) As such, Prudential's decision was reasonable and supported by the administrative record.  Thus, judgment should be entered in favor of Prudential.

C.     **The Surveillance Reports Directly Contradict Plaintiff's Self-Reported Symptoms and Conditions**

Plaintiff claims Prudential failed to investigate her claims during the administrative appeal process.  (Doc. No. 21 at p. 22.)  However, the use of private investigators directly contradicts Plaintiff's claims, as it is an example of Prudential making a good faith effort to investigate the validity of Plaintiff's claims.  *See e.g. Johnson v. Liberty Life Assur. Co.*, 262 Fed. Appx. 865, 870-871 (10th Cir. 2008) (use of surveillance does not mean that the claims administrator acted in bad faith.)  Moreover, the use of surveillance by Prudential was not procedurally improper.  (*Id.*) ("'[T]here is nothing procedurally improper about the use of surveillance' in connection with the investigation of a disability benefits claim.") (quoting *Delta Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir. 2001)).

Plaintiff claims it is "ludicrous" and "absurd" for anyone to conclude that the surveillance video establishes that Plaintiff is not disabled.  (Doc. No. 21 at p. 18.)  However, surveillance videos are considered acceptable evidence in the 10th Circuit and Plaintiff cites distinguishable cases from other circuits to support her claims.  (Doc. 21 at pp. 18-19; *Niedens v. Cont'l Cas. Co.*, 258 Fed. Appx. 216, 221 (10th Cir. 2007) (unpublished opinion) (upholding the district court's determination that the administrator did not act arbitrarily or capriciously when it denied the plaintiff's disability benefits in part because the surveillance video showed Plaintiff could perform daily activities.); *Rizzi v. Hartford Life & Accident Ins. Co.*, 613 F. Supp. 2d 1234 (D.N.M. 2009) (granting judgment for defendants where surveillance was one of the main reasons for the denial of benefits where "[p]laintiff's complaint rest[ed] so heavily on her subjective reporting rather than objective evidence" and the surveillance showed plaintiff

performing activities which she claimed she could not do.))  Thus, Plaintiff's arguments miss the mark.

First, Plaintiff's self-reported symptoms are inconsistent with her observed activities. (Doc. No. 21 at p. 18.)  Second, if Plaintiff can carry out the activities in the video, which would be required in a light duty occupation, it is reasonable to conclude that she can perform the duties of her sedentary occupation.[9]  (*Id.*)  Third, Plaintiff attempts to compare her undiagnosed, unexplained symptoms of pain and trouble concentrating to that of a "mentally retarded, illiterate, partially blind, partially deaf, arthritic man with arteriosclerotic heart disease, thyroid insufficiency and high blood pressure", yet Plaintiff accuses Prudential of being "completely disingenuous" and making "quantum leaps".  (*Id.* at pp. 18-19 (citing *Osbun v. Auburn Foundry, Inc.* 293 F. Supp. 2d 863, 870 (N.D. Ind. 2003).)

Plaintiff claims that her "*gait is very shaky and unstable*" (Doc. No. 21 at p. 8.) and that she has numerous falls and near falls because of her problems walking (D0010.).  Her friend claims that she falls while walking between her bed and the bathroom and that "*her balance is so bad she runs into walls walking down the hallway.*" (D0060.)  Yet, in the video Plaintiff's gait is *perfectly* normal.  On November 16, 2006, Plaintiff was observed not only moving a box, which Plaintiff claims was empty, but bending over to inspect either a satellite dish or Plaintiff's townhome's foundation, and readjusting her doormat. (D0016, D0084-85.)  A few weeks later, on November 30, 2006, Plaintiff was observed shoveling snow off of her back deck.  (D0017.)  While, this might be insignificant activity in many disability cases, where participants suffer from significant, diagnosed medical problems, these actions are crucial in Plaintiff's case because her claims are heavily based on her undiagnosed inability to walk and inability to perform basic tasks.

---

[9] Plaintiff claims Prudential was arbitrary and capricious for not knowing what Plaintiff's specific job duties were.  (Doc. No. 21 at p. 24.)  However Plaintiff is again mistaken, as the record demonstrates Prudential did request and receive Plaintiff's job duties from her former employer.  (D0185-87.)  Further, the Plan specifically provides that "Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." (D0451.)  Thus, Prudential was well within its rights to determine if Plaintiff could perform her regular occupation, even if they never requested Plaintiff's job description.  (*Id.*)  Thus, Plaintiff's arguments that Prudential's actions were arbitrary and capricious on this basis are dead wrong.  (Doc. No. 21 at p. 24.)

Plaintiff attempts to minimize the significance of her activities in her second appeal letter. (D0085.)  However, Plaintiff exhibits significant balance when she cradled her purse and paper work under her left arm and then bent down to straighten her door mat with her right hand. (D0085.)  This is remarkable balance for a person who claims to have trouble walking without falling and running into things.  Further, Plaintiff claims she "has no strength in her hands," "cannot lift or carry anything", which is supported by her friend who claims on bad days, "she drops everything she picks up."  (Doc. No. 21 at p. 8; D0010, D0060.)  Yet, Plaintiff is observed shoveling snow, which is no easy feat even for small areas – as indicated by Plaintiff when she states she would never attempt to shovel the entire deck.[10]  (D0085.)

The court's opinion in *Rizzi*, 613 F. Supp. 2d at 1243, goes through Plaintiff's arguments and explains why they are without merit.  The court explained:

> Plaintiff objects to Defendant's use of video surveillance and reliance on that surveillance as one of its factors in determining that Plaintiff is not disabled. … In addition to criticizing Defendant's decision to undertake surveillance in the first place, Plaintiff argues that the amount of activity captured on tape (approximately 32 minutes) over the five days of surveillance does not show an ability to sustain such a level of activity on a continuous basis, and that the video is of little significance because it does not demonstrate that Plaintiff was capable of performing the essential duties of her occupation and therefore cannot serve as substantial evidence for Defendant's decision to discontinue benefit payments. Plaintiff also claims that Defendant's use of the surveillance tape in making its determination that she was not disabled necessarily meant that Defendant assumed that "only something [as] extreme" as "be[ing] bedridden and immobile during every second of the day" would disable her from working.
>
> The Court does not find that Defendant's use of the results of its surveillance as one piece of evidence that it used to make its determination rendered that determination arbitrary and capricious. Plaintiff had represented herself to be extremely limited in her functionality, maintaining that she could not walk for more than two blocks without resting, could not stand for more than fifteen minutes, could not be away from home for more than an hour, and could not use her right hand. The tape and accompanying narrative of the surveillance by the investigator indicated that Plaintiff had a significantly higher degree of functionality than she had claimed in her application and interview. In a case such

---

[10] Plaintiff indicates that she is required to keep her entire deck clean but does not state who cleans it.  (D0085.)  More importantly, she does not claim November 30, 2009, the day she was shoveling snow, was a "good day," further supporting the reasonableness of Prudential's decision.  (*Id.*)  If Plaintiff can shovel snow on a bad day, then it is not unreasonable to conclude she can type, answer phones, and perform her other duties as a legal secretary as outlined above.

as this one, where Plaintiff's claimed disability stems largely from her subjective representations of pain and accompanying physical limitations, her credibility is paramount. Surveillance showing Plaintiff exceeding her claimed limitations on each of the days in question is evidence that Defendant could quite reasonably consider in making its determination.

(*Id.*)

Thus, while the surveillance video is short, it provides concrete evidence which made it reasonable for Prudential to conclude that Plaintiff was not disabled. *Rizzi*, 613 F. Supp. 2d at 1243 ("That the length of the video tape is short compared to the total surveillance time does not serve to discount the importance of the surveillance.") The ease in which Plaintiff conducted these tasks illustrate that Prudential's determination that Plaintiff is capable of performing her sedentary job as a legal secretary was reasonable. Nothing in the surveillance report supports the Plaintiff's assertions that she can barely walk, has to spend most of her days in bed, or that she in unable to perform basic everyday duties of life. Plaintiff claims that the reason she was caught walking without any signs of an abnormal gait in the video and that her significant abnormal gait has never been documented by her doctors is because she was always having a "good day" when she was being observed by video or her doctors[11]. (Doc. No. 21 at 16.; *see e.g. Rizzi*, 613 F. Supp. 2d at 1242 (the court did not find the administrator's decision was arbitrary and capricious despite plaintiff's explanation that "her activities in the videos … "represented her above normal level of functionality".")) Unlike *Osbun*, 293 F. Supp. 2d at 870, the surveillance report is just one of several factors Prudential considered when making its benefits determination; not the sole basis[12]. (Doc. No. 21 at pp. 18-19.) Thus, Prudential's decision was reasonable, not arbitrary and capricious, and judgment should be granted in Prudential's favor.

### D. The Award of Disability Benefits From the Social Security Administration is not Outcome Determinative or Proof that Prudential's Decision was Arbitrary and Capricious

Plaintiff argues that Prudential "completely dismissed" a key piece of evidence by not "bothering to find out the rules" for being approved for Social Security disability benefits.

---

[11] Apparently, Plaintiff only has "bad days" when she is being observed by her friends and family. (D0060.)

(Docket No. 21, p. 7.) Plaintiff appears to contend that because the SSA determined Plaintiff was disabled Prudential's decision must be arbitrary and capricious because Prudential reached a different conclusion. (Docket No. 21, pp. 14, 17.) This argument is completely unfounded.

As an initial matter, Plaintiff's position overlooks the fact that Prudential must make its benefits determination decisions based upon the evidence submitted to it and the governing Plan terms. Plaintiff submitted the SSA award letter to Prudential, but that letter does not indicate the basis for Plaintiff's receipt of SSA benefits or the evidence considered by the SSA. (D0075-80.) Furthermore, the SSA's determination is governed by standards that are inapplicable to Prudential and other administrators of ERISA-governed plans, such as mandated deference to the opinions of a claimant's treating physicians. *E.g., Black & Decker*, 538 U.S. at 829 (holding that although SSA regulations require administrative law judges to assign greater weight to the opinions of treating physicians, "courts have no warrant to require administrators to automatically accord special weight to the opinions of a claimant's physician"). Thus, the SSA's decision does not bind Prudential. *Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan*, 26 Fed. Appx. 811, 817 (10th Cir. 2001) (unpublished decision) (finding that SSA determinations do not compel automatic awards of ERISA benefits and "are entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes"); *Waugh*, 2008 U.S. Dist. LEXIS 49237 at *48 ("Unless the Plan's language specifically required the Plan Administrator to defer to SSA decisions, which the Plan does not, the Plan was not bound to the [Administrative Law Judge's] ALJ's finding"); *Buzby v. Metropolitan Life Ins. Co.*, No. 04-2631, 2008 WL 2834202 at *5 (D. Col. July 21, 2008) (insurers are not required to "adhere to, or even give weight to, [the Social Security Administration's] determination.")

Further, even the Physical Residual Functional Capacity Assessment, taken by Amy Crockett on behalf of the SSA, shows that Plaintiff has a GAF of 55 to 50, which would make her capable of working. (Doc. No. 21 at pp. 8-9; D0358-59.) Moreover, she concluded that

---

[12] The court determined that the administrator's other basis, a phone call to plaintiff's treating physician, was not a valid basis of support of its benefits decision. *Osbun*, 293 F. Supp. 2d at 869.

LEGAL02/31818314v2

Plaintiff had the cognitive ability to learn and retain information for several work-related tasks. (*Id.*)

Moreover, Prudential had no reason to investigate the SSA's benefits standards, as Prudential made it clear in its determination letter that the standards were different.  (D0360.) Prudential specifically informed Plaintiff:

> [T]hat the SSA must make their determinations based on the information available to them and their rules and guidelines. We must render our decisions based on the information available in your LTD file and the provisions of the LTD policy. As such, the approval of one type of benefit does not mean that another type of disability benefit will be approved. Nor does the denial of one type of benefit mean that another type of disability benefit will be denied.

(*Id.*)  Thus, Prudential's decision cannot be deemed arbitrary and capricious when the Plan does not require Prudential to defer to the decision of the SSA.  *See Wilcott v. Matlack, Inc.*, 64 F.3d 1458, 1461 (10th Cir. 1995) (the plan administrator's refusal to award benefits based on SSA's determination was arbitrary and capricious, because plan included specific language deferring to SSA's decision).

## **CONCLUSION**

Despite Plaintiff's treating physicians' conclusory and unsubstantiated statements that Plaintiff is unable to work, the actual evidence in Plaintiff's medical records do not support Plaintiff's claim that she is disabled.  Notwithstanding Plaintiff's attempts to discredit the claims process, Prudential's review was properly performed and their decision was reasonable.  Thus, for all of the foregoing reasons, the Court should deny Plaintiff's Motion and enter judgment in favor of the Defendants and grant such other and further relief as the Court deems fit.

This 6th day of May, 2010.

Respectfully submitted,

/s/ Lena Moeller
Lena Moeller
WHITE AND STEELE, P.C.
600 17th Street, Suite 600N
Denver, Colorado 80202
Phone 303-296-2828
Fax 303-296-3131

Maya Simmons, Esq.
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Phone: (404) 881-7000
Fax: (404) 253-8401
Maya.Simmons@alston.com

**Counsel for The Prudential Insurance Company
of America**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Glenn E. Smith, Esq.

<u>/s/ Lena Moeller</u>
Lena Moeller