GLENN E. SMITH
GLENN E. SMITH & ASSOCIATES
216 LONGS PEAK DRIVE
CHEYENNE, WY 82009
Telephone: (307) 635-4912

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAY 1 4 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **PAMELA R. GOERTZ, a Wyoming resident,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs**. | ) | Civil No. 09-cv-236 |
| | ) | |
| | ) | |
| **THE PRUDENTIAL INSURANCE COMPANY** | ) | |
| **OF AMERICA, a New Jersey corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S SUMMARY JUDGMENT BRIEF

**COMES NOW** the Plaintiff in the above referenced action, by and through her attorney of record, Glenn E. Smith, and for her Reply to Defendant's Response to her Motion for Summary Judgment states as follows:

### INTRODUCTION

Plaintiff is an unassuming sixty-one year old woman with a remarkably consistent and stable thirty-eight year work history as a legal secretary and paralegal. In January of 2006 she suffered a Grand Mal seizure while at work in Denver, Colorado. At the time Plaintiff was earning $4466.68 per month. She has not worked a single day since that time because of an accumulation of medical problems, conditions, and undiagnosed symptoms, including chronic back and leg pain, dizzy spells, chronic headaches, weakness in her limbs, and fatigue. Plaintiff lives alone and takes care of herself. She applied for and was quickly approved for Social Security disability benefits on the basis

that she was totally disabled from all work for which she was qualified to perform. Her benefit claim for disability benefits under the Plan was just as quickly rejected by the Defendant and sustained during two appeals taken by the Plaintiff.

After filing her benefit claim, Plaintiff was not greeted by an impartial claims administrator who, under ERISA, is charged with acting "solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C.§1104. Instead, she was met by the Defendant who, after denying her initial claim, set about the task of reinforcing its denial during two appeals by hiring physician-reviewers (dependent upon insurers for their income). These reviewers engaged in a paper review of medical records in an effort to show that there really wasn't anything wrong objectively wrong with Plaintiff. Defendant then proceeded to place Plaintiff under surveillance after her claim had already been denied to further bolster its claim denial. Through the two appeals, finally, Defendant engaged in a selective review of evidence that supported only the Defendant's point of view. Evidence favoring the Plaintiff, such as three different opinions from three different treating physicians, all of whom said Plaintiff was totally disabled, was ignored.

During this process, Defendant has accused the Plaintiff of "insurance fraud" because Plaintiff had the audacity to challenge Defendant's rather incredible statement that surveillance video proved she could perform the duties of her job ("Plaintiff's attempts to discredit the surveillance video are a transparent attempt to save her claim and avoid insurance fraud charges."). Response, p. 16. That statement by the Defendant is not only offensive – it is unbelievable that any reputable insurer would make such a claim under the facts of this case. In order to accept the notion that Plaintiff is lying about her symptoms and conditions that prevent her from working, one must believe that Plaintiff simply forfeited a thirty-eight year career, and a job that paid her $4466.68 in monthly salary, in order to horns waggle $1318.01 in monthly disability benefits from Defendant. By Plaintiff's calculations, faking her illness thus far so she can obtain her $1318.01 in monthly disability benefits from Defendant already cost her a total of $232,267.36 in salary at her place of employment (52 months since she last worked times $4468.68 per month), far more than the total of disability benefits she is eligible to receive in the four

2

remaining years before she turns sixty-five years of age. One must believe, additionally, that Plaintiff would take narcotic pain relievers for years when she didn't need to just to support a fraudulent claim for disability benefits. In order to complete this conspiracy, one must also believe that Plaintiff's three treating physicians, friends, relatives, and business associates are all part and parcel of the same conspiracy. One must further believe that Plaintiff would willingly incur as much in medical expense for doctors, tests, treatment, and prescriptive drugs to promote this conspiracy as she is trying to recover from the Defendant. Indeed, if Plaintiff is faking her symptoms, why didn't she simply quit going to doctors and buying expensive drugs years ago and call it even? Perhaps Defendant believes that even the Social Security Administration is part of Plaintiff's effort to defraud the Defendant, inasmuch as Social Security specifically found Plaintiff to be totally disabled not only from her job as a paralegal, but from all work for which she is qualified. Does any of this make any sense?

Even more demeaning is the manner in which the Defendant mocks the Plaintiff for claiming that she feels much better on some days than others, and consequently is able to engage in more activity on "good" days ("Apparently, Plaintiff only has 'bad days' when she is being observed by her friends and family"). Response, p. 22, n. 11. Defendant goes even further. Defendant accuses the Plaintiff of disclosing that she has "good days" and bad days" only after she found out that she had been placed under surveillance and needed some way of explaining how she was able to engage in the activity shown on the video. Response, p. 8. This is patently absurd. On March 13, 2006, for example, Plaintiff complained about having good days and bad days to Dr. Ginsburg long before her disability claim was ever filed. AR 217. Even Defendant knows that pain levels are not constant, that symptoms similar to those reported by Plaintiff, such as chronic pain, dizzy spells, and headaches, may be severe one day and gone the next, only to reappear a day or two later. Is this so difficult for an insurance company who specializes in adjudicating disability claims to accept?

Defendant has engaged in so many misstatements, mischaracterizations, false assumptions, and disingenuous attempts to shape the administrative record in the manner that best suits its purposes that it is impossible to rebut them all in a ten-page

reply brief.  The tactics employed by Defendant in attempted to paint Plaintiff as dishonest and fraudulent, however, need be exposed for what they are.  Defendant asserts that Plaintiff failed to mention she was having a "good day" when she cleared a small path of snow on her deck for her pets.  Response, p. 18.  Therefore, since Plaintiff failed to mention this happened on a "good day," Defendant reasons it must have occurred on a "bad day."  *Id.*  From there, Defendant leaps to the ridiculous conclusion that if Plaintiff can shovel snow on a bad day, it is not unreasonable to conclude that she can type, answer phones, and do other things secretaries do!  *Id.*  As another example of its disingenuous tactics, Defendant claims that it had no reason to believe that Plaintiff's reference to "white matter brain disease" and the white matter gliosis referred to by Dr. Narotzky were interchangeable terms and for that reason did not investigate further into the white matter changes in Plaintiff's brain.[1]  ("Thus, Prudential had no reason to know "white matter brain disease" was an issue that needed to be looked into, especially since the neither Plaintiff's treating physicians or the Independent Medical Reviewers ever mentioned "white matter brain disease").  Although this is preposterous in itself, there is one very important thing wrong with this statement.  Plaintiff did not begin using the term "white matter brain disease" until she submitted her summary judgment brief, long after Defendant should have investigated the white matter changes in Plaintiff's brain to see if they might explain Plaintiff's symptoms.  Other examples abound.

## LEGAL ARGUMENT IN REPLY TO DEFENDANT'S RESPONSE

Defendant's arguments in response to Plaintiff's summary judgment brief can be summarized as follows: (1) Plaintiff's claim is barred by the contractual limitation period set forth in the plan; and (2) Defendant's claim denial was reasonable, and hence not arbitrary and capricious, for all the reasons set forth in Defendant's Response Brief.

## A. PLAINTIFF'S CLAIM IS BARRED BY THE PLAN'S THREE-YEAR CONTRACTUAL LIMITATION PERIOD.

---

[1] Defendant criticizes Plaintiff for an unlawful attempt to supplement the admistrative record by referring to a web site for information pertaining the white matter brain disease. Response, p. 18, n. 8.  Defendant overlooks the fact that the parties may go beyond the administrative record to define and explain medical terminology. *Jewell v. Life Ins. Co. of North American*, 508 F.3d 1303, 1311 (10th Cir. 2007).

The Plan contains a three-year contractual limitation period as follows: "You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law." AR 465. Defendant calculates the last date upon which proof of claim could have been filed in this case was September 13, 2006 and, therefore, contends that any suit filed by Plaintiff after September 13, 2009 is time-barred by the Plan's three-year contractual limitation clause.   Response, p. 12-13.  Plaintiff commenced this suit on October 16, 2009.

In reply to Defendant's argument, Plaintiff does not contend that the Plan's contractual limitation period itself is unenforceable or provides an unreasonably short period of time in which to initiate legal action against the Plan. As Defendant correctly anticipated in its Response brief (p. 13, n.5), however, Plaintiff strongly contends that the Plan's three-year limitations period was equitably tolled during the time Plaintiff was required by Tenth Circuit law to exhaust her administrative remedies.[2] See *Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir. 1990). If the limitation was thus tolled, Plaintiff initiated this suit well within the three-year period set forth in the Plan.

Citing the recent Tenth Circuit case of *Salisbury v. Hartford Life & Accident Ins. Co.*, 583 F.3d 1245, 1248-49 (2009), Defendant argues that this issue has already been decided by the Tenth Circuit in its favor. Defendant claims, in other words, that *Salisbury* specifically rejected the Plaintiff's argument in this case that the Plan's contractual limitation clause was tolled while Plaintiff was satisfying the exhaustion requirement. In Defendant's own words:

Plaintiff may argue that the contractual limitations period was tolled during Plaintiff's appeal. **However, this argument has been rejected by 10th Circuit Courts where, as in this case, the defendant did not prevent plaintiff from filing suit within the contractual limitations period even though time began accruing before the administrative appeal process ended** (citing *Salisbury*). * * * **Thus, any requests that**

_____

[2] Plaintiff did not receive a final determination that her claim was denied by the Defendant until April 5, 2007. Thus, if the running of the three year limitation is equitable tolled while Plaintiff was exhausting her administrative remedies, Plaintiff had until April 5, 2010 in which to file this lawsuit.

**tolling be applied to Plaintiff's claim must be denied.** Response, p. 13.
N. 5. [Bold emphasis added].

This is an egregious and blatant misrepresentation of what was said in *Salisbury*
and should not be countenanced by this Court. In discussing the issue, but not deciding
it, the Tenth Circuit discussed the recent Fourth Circuit case of *White v. Sun Life Assur.
Co. of Can.*, 488 F.3d 240, 247 (2007) and its holding that a contractual limitation of
action period cannot commence while the plan is still considering internal appeals) was a
proper one. While the *Salisbury* court was not persuaded that it need go as far as *White*,
it signaled an intention, nonetheless, to craft a less drastic remedy that includes equitable
tolling while administrative remedies are being exhausted. In the words of the Court:

> We recognize that a benefits claimant must pursue the administrative
> process to its conclusion before filing an ERISA suit. We are not persuaded,
> however, by *White*'s reasons for refusing to enforce the contractual
> limitations provision simply because the plan allowed the claimant's cause
> of action to accrue before the end of the administrative process. *See* 488
> F.3d at 246-53. Less drastic remedies that would take account of both the
> Plan's right to set a limitations period and the claimant's need to exhaust
> administrative remedies would be to allow a claimant at least a reasonable
> time after exhaustion of administrative remedies **or to apply equitable
> tolling during the pendency of the administrative review process.**
> [Bold emphasis added]. *Supra* at 1249.

Thus, far from deciding this issue against the Plaintiff, as Defendant unabashedly
argues before this Court, *Salisbury* proposed a middle ground solution that includes
"equitable tolling during the pendency of the administrative review process." Furthermore,
the Tenth Circuit has not decided this issue, as Defendant falsely represents to the Court.
Response, p. 13, n.5. Even if *Salisbury* favored the Defendant's position, and it does not,
the part of the decision relevant to the issue at hand is *dicta*. The issue remains an open
one in the Tenth Circuit notwithstanding Defendant's misrepresentations to the contrary.

Of all the cases that have addressed this precise issue, according to *Salcedo v.
John Hancock Mut. Life Ins. Co.*, 38 F.Supp.2d 37, 43 (D.Mass. 1998), the majority, and
better reasoned cases, are those which measure the limitation period from the denial of
the final administrative appeal [collecting cases] and not from the time proof of loss is
completed. The reasons are compelling and many. As stated in *Salcedo*:

Moreover, accrual upon denial of a claimant's appeal furnishes the fairest result. It avoids shortening the limitations period by measuring it from a date earlier than that on which the plaintiff would be permitted to file suit. Time spent in pursuing internal appeals should not be charged to the plaintiff, for there has been no unequivocal repudiation of a plaintiff's right to benefits until the review is concluded. Furthermore, as a policy matter, a limitation period that overlaps the time for administrative appeals would not foster, and might well hinder, the goals of the internal appeals process. "Allowing a reasonable period of time to pursue [a] claim through administrative channels insures to all the benefit of internal administrative dispute resolution."

For all of these reasons, the Plan's three year limitation period should have begin running on April 5, 2007, the date that Plaintiff exhausted her administrative appeals. A contractual limitations clause should not commence running until there is a final order that can form the basis of a suit challenging an adverse claim determination under ERISA.

**B. TRY AS IT MAY TO CLAIM OTHERWISE, DEFENDANT COMPLETELY REFUSES TO CREDIT THE OPINIONS OF PLAINTIFF'S THREE TREATING PHYSICIANS, EACH OF WHOM SAYS THAT PLAINTIFF IS TOTALLY DISABLED.**

As much as the Defendant tries to dance around this issue, it cannot refute the fact that the opinions of Plaintiff's three treating physicians in this case, each of whom represented to the Defendant that Plaintiff was totally disabled from work, were summarily and blatantly ignored by the Defendant. Defendant can claim all it wants that all three opinions were "considered." Response p. 18. Defendant can also claim that it did not ignore any evidence favoring Plaintiff's disability. Response, p. 15. Yet these self-serving statements are clearly belied by the Defendant's own administrative record. Nowhere in the Defendant's decision letters denying Plaintiff's two appeals, nowhere in any of the written reports submitted by Defendant's physician reviewers, and nowhere in the remaining administrative record are the opinions of Plaintiff's treating physicians even mentioned by the Defendant, much less discussed or analyzed. One would think that a claims administrator, as an impartial ERISA fiduciary, would want to know why three different treating physicians all found Plaintiff to be totally disabled. Not this Defendant. This Defendant was too hell bent on denying Plaintiff's claim from the very beginning and, once denied, too concerned about supporting that denial with paper reviews from its own

physician reviewers and surveillance from a team hired to "catch" the Plaintiff engaging in physical activity to be concerned with contrary medical opinions from three different physicians. Simply put, Defendant's decision to deny disability benefits cannot pass the test of reasonableness without accounting for the opinions of three different physicians, each of who represented to the Defendant that Plaintiff was totally disabled from work. The failure of the Defendant's physician reviewers to even mention the opinions of the treating opinions detracts from the weight such opinions may otherwise have. *Sandoval v. Aetna Life & Cas. Co.*, 967 F.2d 377, 382 (10th Cir. 1992). As the Defendant itself acknowledges, it is arbitrary and capricious for an administrator to credit the opinions of treating physicians. *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325-26 (10th Cir. 2009). Response, p. 18-19.

## C. THE SURVEILLANCE VIDEO DOES NOT DEMONSTRATE THAT PLAINTIFF CAN PERFORM THE MATERIAL DUTIES OF HER OCCUPATION.

The disabling symptoms that have plagued the Plaintiff since June of 2006 are not inconsistent with Plaintiff's "observed activities," as Defendant tries to claim over and over again. Response, p. 20. When Plaintiff complained that her "gait is shaky and unstable," for example, that does not mean that she suffers from that condition every hour of every day of her life, no more so than she suffers from chronic headaches every hour of every day. *Id.* These symptoms subside and reappear. As she has consistently maintained from the beginning, Plaintiff has her good days in which she can engage in increased physical activity (albeit at a price the following day) and her bad days, in which she can't even get out of bed. The fact that Plaintiff was observed walking from her car to her house without an "unstable gait" on any particular day is meaningless. Further, Plaintiff has never claimed that on a day in which she is feeling good (which, not coincidentally, is when she leaves the house to buy groceries and dugs) she couldn't walk, bend over, or climb a few steps. Defendant further attempts to dramatize Plaintiff's effort at "shoveling snow off her back deck" and, in the process, hopes to conjure an image of a sixty-one year old woman throwing twenty pounds of snow over her shoulder with a scoop shovel every ten seconds. As the video itself indicates, Plaintiff did nothing more than clear a foot wide path of two or three inches of powder snow so her pets would have a way to get

8

outside without tracking through the snow. In so doing, she never lifted the snow shovel from the floor of the deck.

While the Plaintiff's job duties do appear in the administrative record, AR 186-87, the Defendant made to effort whatsoever to correlate the "physical activity" on the videotape with the physical and mental requirements of her job. Just because Plaintiff can make the thirty second journey from her car to her door without apparent difficulty in the video does not mean that she can physically sit at a desk eight hours a day, forty hours a week. Moreover, the activities shown on the video clearly do not demonstrate that Plaintiff is capable of the concentration, focus, and organizational skills necessary to perform her job (especially while taking narcotic pain medication), or that she has the energy to perform them. Amy Crocket, the Social Security psychologist, specifically found that Plaintiff was not able to continue working for these very reasons. AR 92. In short, the activity on the video does not reveal how the Plaintiff's chronic headaches, dizzy spells, or debilitating back and leg pain affect her ability to do her job. Indeed, the activities depicted on surveillance have nothing to do with the physical and mental requirements of Plaintiff's job as a paralegal.

### D. OTHER ISSUES

The Defendant claims that it considered Plaintiff's various illnesses "in their totality, not separately as Plaintiff claims." Response, p. 18. As Defendant's only proof of this statement, quite astonishingly, is Defendant's very next statement: "There is nothing in the record that indicates that Prudential did not consider the combined effect of Plaintiff's symptoms and conditions." *Id.* Plaintiff has scoured the administrative record with a fine-tooth comb. There is no indication whatsoever that Defendant ever considered the totality of Plaintiff's medical problems in determining that she was not totally disabled from performing her job. Instead, Defendant evaluated each medical problem individually and concluded that each illness or condition, standing alone, was not in and itself disabling. This is arbitrary and capricious. *DeGennaro v. Liberty Life Assur. Co. of Boston*, 561 F.Supp.2d 817 (W.D. Mich. 2008).

Defendant argues at length that its refusal to blindly accept Social Security's finding of total disability is not arbitrary and capricious. Response, p. 22-24. Of course it

9

is not. At no time has the Plaintiff ever argued that the Social Security determination was binding upon the Defendant. This doesn't mean, however, that Defendant should have ignored the Social Security finding altogether. While not arbitrary per se, it is among the "serious concerns" that, "taken with some degree of conflicting interests, provides a proper basis for concluding that the administrator abused its discretion." *DeLisle v. Sun Assur. Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009).

Defendant argues that its physician reviewers found that Plaintiff was "fully capable of performing her job duties as a legal secretary." Response, p. 18. They made no such finding. Nowhere in the administrative record did any physician reviewer discuss Plaintiff's specific job duties. Moreover, the opinions of the physician reviewers were all premised on their finding that medical tests did not document any functional impairment and there was no objective medical evidence to support Plaintiff's disabling symptoms. Response, p. 17. As the vast majority of courts who have considered the issue have held, ERISA claim administrators cannot deny a claim for disability benefits solely because the claimant provided to provide "objective" medical evidence, unless the plan provides otherwise. *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442-43 (3rd Cir. 1997); *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1047 (8th Cir. 2001); and *Willis v. Baxter Intern., Inc.,* 175 F.Supp.2d 819, 831 (W.D.N.C. 2001). In this instance, the Defendant's plan does not require that disability be proven by objective testing or medical evidence. AR 464. Thus, it is arbitrary and capricious to impose this requirement on Plaintiff when the plan itself does not require it.

Dated this 14th day of May, 2010.

Respectfully submitted,
Pamela R. Goertz.

BY: ______________________________

Glenn E. Smith
Glenn E. Smith & Associates
216 Longs Peak Drive
Cheyenne, Wyoming 82009
(307) 635-4912
Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2010 I served the foregoing PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S SUMMARY JUDGMENT BRIEF by emailing a true and correct copy thereof to:

Maya Simmons, Esq.
ALSTON & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
`

Glenn E. Smith